MUTUAL LIFE INSURANCE COMPANY *v.* HILLMON.

MUTUAL LIFE INSURANCE COMPANY *v.* HILLMON.

NEW YORK LIFE INSURANCE COMPANY *v.* HILL-
MON.

CONNECTICUT MUTUAL LIFE INSURANCE COM-
PANY *v.* HILLMON.

ERROR TO THE CIRCUIT COURT OF· THE UNITED STATES FOR THE
DISTRICT OF KANSAS.

Nos. 181, 182, 183, 184. Argued March 2, 3, 1892. — Decided May 16, 1892.

Under Rev. Stat. § 921, a court of the United States may order actions
against several insurers of the same life, in which the defence is the
same, to be consolidated for trial, against their objection.

The consolidation for trial, under Rev. Stat. § 921, of actions against several
defendants, does not impair the right of each to three peremptory chal-
lenges under § 819.

The intention of a person, when material, may be proved by contempora-
neous declarations in his letters, written under circumstances precluding
a suspicion of misrepresentation.

Upon the question whether a person left a certain place with a certain other
person, letters written and mailed by him at that place to his family, shortly
before the time when other evidence tends to show that he left the
place, and stating his intention to leave it with that person, are compe-
tent evidence of such intention.

On July 13, 1880, Sallie E. Hillmon, a citizen of Kansas,
brought an action against the Mutual Life Insurance Com-
pany, a corporation of New York, on a policy of insurance,
dated December 10, 1878, on the life of her husband, John W.
Hillmon, in the sum of $10,000, payable to her within sixty
days after notice and proof of his death. On the same day the
plaintiff brought two other actions, the one against the New
York Life Insurance Company, a corporation of New York,
on two similar policies of life insurance, dated respectively
November 30, 1878, and December 10, 1878, for the sum of

$5000 each; and the other against the Connecticut Mutual Life Insurance Company, a corporation of Connecticut, on a similar policy, dated March 4, 1879, for the sum of $5000.

In each case, the declaration alleged that Hillmon died on March 17, 1879, during the continuance of the policy, but that the defendant, though duly notified of the fact, had refused to pay the amount of the policy, or any part thereof; and the answer denied the death of Hillmon, and alleged that he, together with John H. Brown and divers other persons, on or before November 30, 1878, conspiring to defraud the defendant, procured the issue of all the policies, and afterwards, in March and April, 1879, falsely pretended and represented that Hillmon was dead, and that a dead body which they had procured was his, whereas in reality he was alive and in hiding.

On June 14, 1882, the following order was entered in the three cases: "It appearing to the court that the above-entitled actions are of like nature and relative to the same question, and to avoid unnecessary cost and delay, and that it is reasonable to do so, it is ordered by the court that said actions be, and the same are hereby, consolidated for trial." To this order the defendants excepted.

On February 29, 1888, after two trials at which the jury had disagreed, the three cases came on for trial, under the order of consolidation. Each of the defendants moved that the order be set aside, and each case tried separately. But the court overruled the motion, and directed that, pursuant to that order, the cases should be tried as one cause; and to this each defendant excepted.

At the empanelling of the jury, each defendant claimed the right to challenge peremptorily three jurors. But the court ruled that, the cases having been consolidated, the defendants were entitled to three peremptory challenges only; and, after each defendant had peremptorily challenged one juror, ruled that none of the defendants could so challenge any other jurors: and to these rulings each defendant excepted.

At the trial the plaintiff introduced evidence tending to show that on or about March 5, 1879, Hillmon and Brown left Wichita in the State of Kansas, and travelled together through

Southern Kansas in search of a site for a cattle ranch; that on the night of March 18, while they were in camp at a place called Crooked Creek, Hillmon was killed by the accidental discharge of a gun; that Brown at once notified persons living in the neighborhood; and that the body was thereupon taken to a neighboring town, where, after an inquest, it was buried. The defendants introduced evidence tending to show that the body found in the camp at Crooked Creek on the night of March 18 was not the body of Hillmon, but was the body of one Frederick Adolph Walters. Upon the question whose body this was, there was much conflicting evidence, including photographs and descriptions of the corpse, and of the marks and scars upon it, and testimony to its likeness to Hillmon and to Walters.

The defendants introduced testimony that Walters left his home at Fort Madison in the State of Iowa in March, 1878, and was afterwards in Kansas in 1878, and in January and February, 1879; that during that time his family frequently received letters from him, the last of which was written from Wichita; and that he had not been heard from since March, 1879. The defendants also offered the following evidence:

Elizabeth Rieffenach testified that she was a sister of Frederick Adolph Walters, and lived at Fort Madison; and thereupon, as shown by the bill of exceptions, the following proceedings took place:

"Witness further testified that she had received a letter written from Wichita, Kansas, about the 4th or 5th day of March, 1879, by her brother Frederick Adolph; that the letter was dated at Wichita, and was in the handwriting of her brother; that she had searched for the letter, but could not find the same, it being lost; that she remembered and could state the contents of the letter.

"Thereupon the defendants' counsel asked the question: 'State the contents of that letter.' To which the plaintiff objected, on the ground that the same is incompetent, irrelevant, and hearsay. The objection was sustained, and the defendants duly excepted. The following is the letter as stated by witness:

"Wichita, Kansas,

" March 4th or 5th or 3d or 4th — I don't know — 1879.

" Dear sister and all: I now in my usual style drop you a few lines to let you know that I expect to leave Wichita on or about March the 5th, with a certain Mr. Hillmon, a sheep-trader, for Colorado or parts unknown to me. I expect to see the country now. News are of no interest to you, as you are not acquainted here. I will close with compliments to all inquiring friends. Love to all.

" I am truly your brother,

FRED. ADOLPH WALTERS."

Alvina D. Kasten testified that she was twenty-one years of age and resided in Fort Madison; that she was engaged to be married to Frederick Adolph Walters; that she last saw him on March 24, 1878, at Fort Madison ; that he left there at that time, and had not returned; that she corresponded regularly with him, and received a letter about every two weeks until March 3, 1879, which was the last time she received a letter from him; that this letter was dated at Wichita, March 1, 1879, and was addressed to her at Fort Madison, and the envelope was postmarked "Wichita, Kansas, March 2, 1879 ; " and that she had never heard from or seen him since that time.

The defendants put in evidence the envelope with the postmark and address; and thereupon offered to read the letter in evidence. The plaintiff objected to the reading of the letter, the court sustained the objection, and the defendants excepted.

This letter was dated " Wichita, March 1, 1879," was signed by Walters, and began as follows :

" Dearest Alvina: Your kind and ever welcome letter was received yesterday afternoon about an hour before I left Emporia. I will stay here until the fore part of next week, and then will leave here to see a part of the country that I never expected to see when I left home, as I am going with a man by the name of Hillmon, who intends to start a sheep ranch, and as he promised me more wages than I could make at anything else I concluded to take it, for a while at least,

until I strike something better. There is so many folks in this country that have got the Leadville fever, and if I could not of got the situation that I have now I would have went there myself; but as it is at present I get to see the best portion of Kansas, Indian Territory, Colorado, and Mexico. The route that we intend to take would cost a man to travel from $150 to $200, but it will not cost me a cent; besides, I get good wages. I will drop you a letter occasionally until I get settled down; then I want you to answer it."

Rulings upon other questions of evidence, excepted to at the trial, are not reported, because not passed upon by this court.

The court, after recapitulating some of the testimony introduced, instructed the jury as follows: "You have perceived from the very beginning of the trial that the conclusion to be reached must practically turn upon one question of fact, and all the large volume of evidence, with its graphic and varied details, has no actual significance, save as the facts established thereby may throw light upon and aid you in answering the question, Whose body was it that on the evening of March 18, 1879, lay dead by the camp-fire on Crooked Creek? The decision of that question decides the verdict you should render."

The jury, being instructed by the court to return a separate verdict in each case, returned verdicts for the plaintiff against the three defendants respectively for the amounts of their policies, and interest, upon which separate judgments were rendered. The defendants sued out four writs of error, one jointly in the three cases as consolidated, and one in each case separately.

*Mr. Julien T. Davies,* (*Mr. J. W. Green* and *Mr. E. L. Short* were on his brief,) for the New York Company, contended as to the consolidation of the causes:

The right of the Circuit Court to try separate causes of a like nature or relative to the same question at the same time and before the same jury, and to consolidate causes, rests upon section 921 of the Revised Statutes of the United States.

Under this statute causes could be tried together, but not necessarily thereby consolidated. The ideas are distinct between trying causes together or consolidating them for trial by order, and directing them to be tried as one cause, and therefore virtually consolidating them.

Under this section, speaking generally, two classes of cases in which in the Circuit Courts of the United States a trial of different causes of action has been had properly at the same time and before the same jury, when such causes were of a like nature or relative to the same question : (1) Where one case is ordered to be tried and the other cases are ordered to abide the event of the one ordered for trial; (2) Where there is an absolute consolidation of different causes of action against the same defendants.

The class of cases, to which those before the court belong, constitutes a third class, in which a consolidation for trial of different causes of action against different defendants for the purposes of saving time has been ordered.

We claimed that the court had no power to make the order here complained of, because: (a) The causes were not of a like nature or relative to the same question ; (b) An order for consolidation for purposes of trial where there are different defendants is not conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice, and is not reasonable. Tidd's Pr. (3d Am. ed.) 614; *Worley* v. *Glentworth*, 5 Halsted, (10 N. J. Law,) 241; *Howard* v. *Chamberlin*, 64 Georgia, 654, 696.

*Mr. Samuel A. Riggs* and *Mr. L. B. Wheat* (with whom were *Mr. John Hutchings* and *Mr. R. J. Borghalthaus* on the brief) for defendant in error.

When the actions were so consolidated that the matter of impanelling a jury was to be proceeded with, § 819, Rev. Stat. was applicable, and limited the parties to three challenges. 1 Thompson on Trials, § 46 and n. 1.

If each plaintiff in error was entitled to three peremptory challenges, then of course the defendant in error would have

been entitled to the same number; so that twelve jurors, equivalent to a full panel, could have been peremptorily challenged without the consent of either one of the defendants; or if each plaintiff in error was entitled to three peremptory challenges and defendant in error to only three, then in addition to this favor being three to one against defendant in error each defendant might have been required to see half of a full panel peremptorily challenged off in addition to the six challenges allowed by that section.

As to the 86th assignment of error relating to testimony of Miss Alvina Kasten it will be noticed that the envelope was introduced in evidence and that witness showed when and from whence she received the letter, but the contents of the letter were not permitted to be given to the jury. Considering that, together with the 74th and 85th assignments of error, we submit that the contents of the three letters therein referred to were incompetent and hearsay. Neither was written by Walters at a time when he expected to die; the statements therein were not made under the obligation of an oath, nor under circumstances in law equivalent thereto; nor under any such circumstances as would render or make them *res gestæ* as to any act or fact competent to be proven. Whether he did or went according to any statement in either of those letters, or whether he had anything to do with any other person, or whether he made or had any transaction with any other person, or knew or had seen any other person named in either of said letters, were questions of fact to be proved as any other fact; and his statement thereof or of any intention in any of said letters expressed, was not competent evidence against any other person whomsoever. Such statements were not *res gestæ* as to any fact, material or competent in this case, but only of the fact of writing the letters.

The contents of those letters were no more competent than a letter written by any other person to any other person would have been if such last mentioned letters had contained similar statements therein, or any other statement. *Insurance Co.* v. *Guardiola,* 129 U. S. 642; *State* v. *Medlicott,* 9 Kansas, 257; *Simpson* v. *Smith,* 27 Kansas, 565; *State* v. *Smith,* 35 Kansas,

618; *Dwyer* v. *Dunbar*, 5 Wall. 318; *People* v. *Fong Ah Sing*, 64 California, 253; *State* v. *Draper*, 65 Missouri, 335, 340; *Barfield* v. *Britt*, 2 Jones (Law) N. C. 41; *S. C.* 62 Am. Dec. 190; *Leiber* v. *Commonwealth*, 9 Bush, 11; *Lund* v. *Tyngsborough*, 9 Cush. 36; *S. C.* 59 Am. Dec. 159; *Commonwealth* v. *Densmore*, 12 Allen, 535; *Rex* v. *Mead*, 2 B. & C. 605.

*Mr. Edward S. Isham* (with whom were *Mr. James W. Green* and *Mr. William G. Beale* on the brief) for the Connecticut Mutual Life Insurance Company, plaintiff in error.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

The order of the Circuit Court that the three actions be consolidated for trial, because they appeared to the court to be of like nature and relative to the same question, because it would avoid unnecessary cost and delay, and because it was reasonable to do so, was within the discretionary power of the court, under section 921 of the Revised Statutes, which provides, in substantial accordance with the act of July 22, 1813, c. 14, § 3, (3 Stat. 21,) that "when causes of a like nature or relative to the same question are pending before a court of the United States, or of any Territory, the court may make such orders and rules concerning proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice, and may consolidate said causes when it appears reasonable to do so."

The consolidation rule, introduced in England by Lord Mansfield, to avoid the expense and delay attending the trial of a multiplicity of actions upon the same question arising under different policies of insurance, enabled the several insurers to have proceedings stayed in all actions except one, upon undertaking to be bound by the verdict in that one, to admit all facts not meant to be seriously disputed, and not to file a bill in equity or bring a writ of error; and was considered as a favor to the defendants; and insurers under different policies could not obtain such a rule without the plaintiff's consent.

1 Tidd's Practice (9th ed.) 614, 615; *McGregor* v. *Horsfall*, 3 M. & W. 320. The English practice appears to have been followed in early times in New York. *Camman* v. *New York Ins. Co.*, 1 Caines, 114; *S. C.* Coleman & Caines, 188; *Thompson* v. *Shepherd*, 9 Johns. 262. The later cases in New York, cited at the bar, were governed by statute. *Brewster* v. *Stewart*, 3 Wend. 441; *Mayor* v. *Mayor*, 64 How. Pract. 230.

Where the English consolidation rule has not been adopted, the American courts, state and federal, have exercised the authority of ordering several actions by one plaintiff against different defendants to be tried together, whenever the defence is the same, and unnecessary delay and expense will be thereby avoided. *Den* v. *Kimble*, 4 Halst. (9 N. J. Law) 335; *Worley* v. *Glentworth*, 5 Halst. (10 N. J. Law) 241; *Witherlee* v. *Ocean Ins. Co.*, 24 Pick. 67; *Wiede* v. *Insurance Cos.*, 3 Chicago Legal News, 353; *Andrews* v. *Spear*, 4 Dillon, 470; *Keep* v. *Indianapolis & St. Louis Railroad*, 3 McCrary, 302; 1 Thompson on Trials, § 210. The learning and research of counsel have produced no instance in this country, in which such an order, made in the exercise of the discretionary power of the court, unrestricted by statute, has been set aside on bill of exceptions or writ of error.

But although the defendants might lawfully be compelled, at the discretion of the court, to try the cases together, the causes of action remained distinct, and required separate verdicts and judgments; and no defendant could be deprived, without its consent, of any right material to its defence, whether by way of challenge of jurors, or of objection to evidence, to which it would have been entitled if the cases had been tried separately. Section 819 of the Revised Statutes provides that in all civil cases "each party shall be entitled to three peremptory challenges; and in all cases where there are several defendants or several plaintiffs, the parties on each side shall be deemed a single party for the purposes of all challenges under this section." Under this provision, defendants sued together upon one cause of action would be entitled to only three peremptory challenges in all. But defendants in different actions cannot be deprived of their several challenges,

by the order of the court, made for the prompt and convenient administration of justice, that the three cases shall be tried together. The denial of the right of challenge, secured to the defendants by the statute, entitles them to a new trial.

There is, however, one question of evidence so important, so fully argued at the bar, and so likely to arise upon another trial, that it is proper to express an opinion upon it.

This question is of the admissibility of the letters written by Walters on the first days of March, 1879, which were offered in evidence by the defendants, and excluded by the court. In order to determine the competency of these letters, it is important to consider the state of the case when they were offered to be read.

The matter chiefly contested at the trial was the death of John W. Hillmon, the insured; and that depended upon the question whether the body found at Crooked Creek on the night of March 18, 1879, was his body, or the body of one Walters.

Much conflicting evidence had been introduced as to the identity of the body. The plaintiff had also introduced evidence that Hillmon and one Brown left Wichita in Kansas on or about March 5, 1879, and travelled together through Southern Kansas in search of a site for a cattle ranch, and that on the night of March 18, while they were in camp at Crooked Creek, Hillmon was accidentally killed, and that his body was taken thence and buried. The defendants had introduced evidence, without objection, that Walters left his home and his betrothed in Iowa in March, 1878, and was afterwards in Kansas until March, 1879; that during that time he corresponded regularly with his family and his betrothed; that the last letters received from him were one received by his betrothed on March 3 and postmarked at Wichita March 2, and one received by his sister about March 4 or 5, and dated at Wichita a day or two before; and that he had not been heard from since.

The evidence that Walters was at Wichita on or before March 5, and had not been heard from since, together with the evidence to identify as his the body found at Crooked

Creek on March 18, tended to show that he went from Wichita to Crooked Creek between those dates. Evidence that just before March 5 he had the intention of leaving Wichita with Hillmon would tend to corroborate the evidence already admitted, and to show that he went from Wichita to Crooked Creek with Hillmon. Letters from him to his family and his betrothed were the natural, if not the only attainable, evidence of his intention.

The position, taken at the bar, that the letters were competent evidence, within the rule stated in *Nicholls* v. *Webb*, 8 Wheat. 326, 337, as memoranda made in the ordinary cour... of business, cannot be maintained, for they were clearly not such.

But upon another ground suggested they should have been admitted. A man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party.

The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it; and while he is still alive, his own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said, and is less trustworthy than letters written by him at the very time and under circumstances precluding a suspicion of misrepresentation.

The letters in question were competent, not as narratives of

facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention. In view of the mass of conflicting testimony introduced upon the question whether it was the body of Walters that was found in Hillmon's camp, this evidence might properly influence the jury in determining that question.

The rule applicable to this case has been thus stated by this court: "Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury." *Insurance Co.* v. *Mosley,* 8 Wall. 397, 404, 405.

In accordance with this rule, a bankrupt's declarations, oral or by letter, at or before the time of leaving or staying away from home, as to his reason for going abroad, have always been held by the English courts to be competent, in an action by his assignees against a creditor, as evidence that his departure was with intent to defraud his creditors, and therefore an act of bankruptcy. *Bateman* v. *Bailey,* 5 T. R. 512; *Rawson* v. *Haigh,* 9 J. B. Moore, 217; *S. C.* 2 Bing. 99; *Smith* v. *Cramer,* 1 Scott, 541; *S. C.* 1 Bing. N. C. 585.

The highest courts of New Hampshire and Massachusetts have held declarations of a servant, at the time of leaving his master's service, to be competent evidence, in actions between third persons, of his reasons for doing so. *Hadley* v. *Carter,*

8 N. H. 40; *Elmer* v. *Fessenden*, 151 Mass. 359. And the Supreme Court of Ohio has held that, for the purpose of proving that a person was at a railroad station intending to take passage on a train, previous declarations made by him at the time of leaving his hotel were admissible. *Lake Shore &c. Railroad* v. *Herrick*, 29 Northeastern Reporter, 1052. See also *Jackson* v. *Boneham*, 15 Johns. 226; *Gorham* v. *Canton*, 5 Greenl. 266; *Kilburn* v. *Bennett*, 3 Met. 199; *Lund* v. *Tyngsborough*, 9 Cush. 36.

In actions for criminal conversation, letters by the wife to her husband or to third persons are competent to show her affection towards her husband, and her reasons for living apart from him, if written before any misconduct on her part, and if there is no ground to suspect collusion; *Trelawney* v. *Coleman*, 2 Stark. 191, and 1 B. & Ald. 90; *Willis* v. *Bernard*, 5 Car. & P. 342, and 1 Moore & Scott, 584; *S. C.* 8 Bing. 376; 1 Greenl. Ev. § 102. So letters from a husband to a third person, showing his state of feeling, affection and sympathy for his wife, have been held by this court to be competent evidence, bearing on the validity of the marriage, when the legitimacy of their children is in issue. *Gaines* v. *Relf*, 12 How. 472, 520, 534.

Even in the probate of wills, which are required by law to be in writing, executed and attested in prescribed forms, yet where the validity of a will is questioned for want of mental capacity or by reason of fraud and undue influence, or where the will is lost and it becomes necessary to prove its contents, written or oral evidence of declarations of the testator before the date of the will has been admitted, in Massachusetts and in England, to show his real intention as to the disposition of his property, although there has been a difference of opinion as to the admissibility, for such purposes, of his subsequent declarations. *Shailer* v. *Bumstead*, 99 Mass. 112; *Sugden* v. *St. Leonards*, 1 P. D. 154; *Woodward* v. *Goulstone*, 11 App. Cas. 469, 478, 484, 486.

In *Shailer* v. *Bumstead*, upon the competency of evidence offered to show that a will propounded for probate "was not the act of one possessed of testamentary capacity, or was

obtained by such fraud and undue influence as to subvert the real intentions and will of the maker," Mr. Justice Colt said: " The declarations of the testator accompanying the act must always be resorted to as the most satisfactory evidence to sus-tain or defend the will, whenever this issue is presented.   So it is uniformly held that the previous declarations of the tes-tator, offered to prove the mental facts involved, are com-petent.   Intention, purpose, mental peculiarity and condition, are mainly ascertainable through the medium afforded by the power of language.   Statements and declarations, when the state of the mind is the 'fact to be shown, are therefore re-ceived as mental acts or conduct."   99 Mass. 120.

In *Sugden* v. *St. Leonards*, which arose upon the probate of the lost will of Lord Chancellor St. Leonards, the English Court of Appeal was unanimous in holding oral as well as written declarations made by the testator before the date of the will to be admissible in evidence.   Lord Chief Justice Cockburn said : " I entertain no doubt that prior instructions, or a draft authenticated by the testator, or verbal declara-tions of what he was about to do, though of course not con-clusive evidence, are yet legally admissible as secondary evi-dence of the contents of a lost will."   1 P. D. 226.   Sir George Jessel, M. R., said : " It is not strictly evidence of the contents of the instrument, it is simply evidence of the inten-tion of the person who afterwards executes the instrument. It is simply evidence of probability — no doubt of a high degree of probability in some cases, and of a low degree of probability in others.   The cogency of the evidence depends very much on the nearness in point of time of the declaration of intention to the period of the execution of the instrument." 1 P. D. 242.   Lord Justice Mellish said : " The declarations which are made before the will are not, I apprehend, to be taken as evidence of the contents of the will which is subse-quently made — they obviously do not prove it; and wherever it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions, there you may prove what he said, because that is the only means by which you can find out what his intentions were."   1 P. D. 251.

Upon an indictment of one Hunter for the murder of one Armstrong at Camden, the Court of Errors and Appeals of New Jersey unanimously held that Armstrong's oral declarations to his son at Philadelphia, on the afternoon before the night of the murder, as well as a letter written by him at the same time and place to his wife, each stating that he was going with Hunter to Camden on business, were rightly admitted in evidence. Chief Justice Beasley said : " In the ordinary course of things, it was the usual information that a man about leaving home would communicate, for the convenience of his family, the information of his friends, or the regulation of his business. At the time it was given, such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong, and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed. If it be said that such notice of an intention of leaving home could have been given without introducing in it the name of Mr. Hunter, the obvious answer to the suggestion, I think, is that a reference to the companion who is to accompany the person leaving is as natural a part of the transaction as is any other incident or quality of it. If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company ? At the time the words were uttered or written, they imported no wrongdoing to any one, and the reference to the companion who was to go with him was nothing more, as matters then stood, than an indication of an additional circumstance of his going. If it was in the ordinary train of events for this man to leave word or to state where he was going, it seems to me it was equally so for him to say with whom he was going." *Hunter* v. *State*, 11 Vroom (40 N. J. Law) 495, 534, 536, 538.

Upon principle and authority, therefore, we are of opinion that the two letters were competent evidence of the intention of Walters at the time of writing them, which was a material

fact bearing upon the question in controversy; and that for the exclusion of these letters, as well as for the undue restriction of the defendants' challenges, the verdicts must be set aside, and a new trial had.

As the verdicts and judgments were several, the writ of error sued out by the defendants jointly was superfluous, and may be dismissed without costs; and upon each of the writs of error sued out by the defendants severally the order will be

*Judgment reversed, and case remanded to the Circuit Court, with directions to set aside the verdict and to order a new trial.*