**John T. WATKINS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 12797.**

United States Court of Appeals District of Columbia Circuit.

Argued en Banc March 6, 1956.

Decided April 23, 1956.

Petition for Rehearing Denied May 22, 1956.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Mrs. Norma Zarky and Messrs. Daniel H. Pollitt and Sidney S. Sachs, Washington, D. C., were on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis Carroll and William Hitz, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

On May 11, 1954, the House of Representatives voted a contempt citation against appellant and on November 22, 1954, he was indicted under 2 U.S.C.A. § 192 on seven counts for refusal to answer questions of a subcommittee of the Committee on Un-American Activities as to whether some twenty-nine or thirty named persons had been members of the Communist Party. Having waived his right to trial by jury, appellant was found guilty in the District Court on all counts. He was fined five hundred dollars; execution of a one-year jail term was suspended and appellant was placed on probation. This appeal followed.

Appellant had been named as a member of the Communist Party for the period 1943–1946 by one Donald O. Spencer, who testified before the Committee in a hearing in Chicago in September 1952. Appellant was identified again as a member of the Communist Party in the early 1940's by one Walter Rumsey, who appeared before the Committee in March 1954.

In his appearance before the Committee, appellant answered questions concerning himself. He admitted cooperating with the Communist Party from 1942 to 1946 and answered concerning the extent of this cooperation. He denied past or present membership in the Communist Party and reiterated these denials specifically with respect to the details of both Spencer's and Rumsey's testimony about him. In the course of this questioning, the following occurred:

[Joint Appendix, at 84, 85]

"Mr. Kunzig: Now, I have here a list of names of people, all of whom were identified as Communist Party members by Mr. Rumsey during his recent testimony in Chicago. I am asking you first whether you know these people. My first question: Warner Betterson?"

Watkins said he did not know the first three persons named. Then he was asked about a Harold Fisher whom he knew, and the following ensued [id. at 85, 86]:

"Mr. Watkins: Mr. Chairman, in regard to that question, I would like to make a very brief statement I

prepared in anticipation of this answer.

"Mr. Velde: You may proceed.

"Mr. Watkins: Thank you. I would like to get one thing perfectly clear, Mr. Chairman. I am not going to plead the fifth amendment, but I refuse to answer certain questions that I believe are outside the proper scope of your committee's activities. I will answer any questions which this committee puts to me about myself. I will also answer questions about those persons whom I knew to be members of the Communist Party *and whom I believe still are.* I will not, however, answer any questions with respect to others with whom I associated in the past. I do not believe that any law in this country requires me to testify about persons who may in the past have been Communist Party members or otherwise engaged in Communist Party activity *but who to my best knowledge and belief have long since removed themselves from the Communist movement.*

"I do not believe that such questions are relevant to the work of this committee nor do I believe that this committee has the right to undertake the public exposure of persons because of their past activities. I may be wrong, and the committee may have this power, but until and unless a court of law so holds and directs me to answer, I most firmly refuse to discuss the political activities of my past associates.

"Mr. Kunzig: And I want to get this clear for the record. You are not in any way raising the fifth amendment?

"Mr. Watkins: I am not.

"Mr. Kunzig: But you are refusing to answer the question I have just asked you?

"Mr. Watkins: Based upon the statement just read, yes.

"Mr. Kunzig: And you, of course, have advice of counsel. He is sitting right next to you at this moment and you just conferred with him, is that correct?

"Mr. Watkins: That is correct.

"Mr. Scherer: Mr. Chairman, I ask that you direct the witness to answer.

"Mr. Velde: Yes. *This committee is set up by the House of Representatives to investigate subversion and subversive propaganda and to report to the House of Representatives for the purpose of remedial legislation.*

"The House of Representatives has by a very clear majority, a very large majority, directed us to engage in that type of work, and so we do, as a committee of the House of Representatives, have the authority, the jurisdiction, to ask you concerning your activities in the Communist Party, concerning your knowledge of any other persons who are members of the Communist Party or who have been members of the Communist Party, and so, Mr. Watkins, you are directed to answer the question propounded to you by counsel.

"Now, do you remember the question that was propounded to you?

"Mr. Watkins: I remember the question, Mr. Chairman, and I have read my answer which, among other things, states that your committee may have this power, and I stand on my statement." [Emphasis supplied.]

Similar refusals and directions to answer followed and, like those previously described in appellant's testimony with regard to Fisher, they became the subject of the various counts of the indictment. In all, appellant refused to answer, although directed to do so, with respect to approximately thirty persons.

Appellant argues that the trial court erred in failing to grant his motion to dismiss the indictment or for acquittal. He says the Committee was exceeding its constitutional powers as a congressional investigating committee; that 2

U.S.C.A. § 192, read together with the Committee's authorizing resolution, was so vague and indefinite as to deprive appellant of due process of law; and that the First Amendment protected appellant against being forced to answer the particular questions asked him.

■ We must delimit the question before us. A majority of the court is of opinion that Congress has power to investigate the history of the Communist Party and to ask the questions Watkins refused to answer. It would be quite in order for Congress to authorize a committee to investigate the rate of growth or decline of the Communist Party, and so its numerical strength at various times, as part of an inquiry into the extent of the menace it poses and the legislative means that may be appropriate for dealing with that menace. Inquiry whether thirty persons were Communists between 1942 and 1947 would be pertinent to such an investigation. The questions asked Watkins could be asked for a valid legislative purpose.

The precise question upon which the decision must rest is a narrow one. It is whether the Act authorized the Committee to ask the questions asked Watkins, in the particular context in which the Committee propounded them, and whether the Committee's purpose in asking the questions was a valid legislative purpose. A majority of the court is of opinion that the questions were pertinent to a valid legislative purpose and were authorized by the Act.

According to the Legislative Reorganization Act of 1946, 60 Stat. 812, at pages 822, 823,[1] the Committee on Un-American Activities is one of several standing committees elected by the House of Representatives. The act sets forth in no uncertain terms the subject and scope of inquiry intrusted to this Committee. It provides, 60 Stat. at page 828:

" '(A) Un-American activities.

" '(2) The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States; (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.' "

In March 1954, the Committee conducted hearings in Chicago. At their commencement the chairman expressed the purpose of the hearings. It was to investigate, for a definite legislative purpose, communist infiltration into labor unions. The chairman stated [Joint Appendix, at 43, 44]:

"Mr. Velde: The committee will be in order. I should like to make an opening statement regarding our work here in the city of Chicago. The Congress of the United States, realizing that there are individuals and elements in this country whose aim it is to subvert our constitutional form of government, has established the House Committee on Un-American Activities. In establishing this committee, the Congress has directed that we must investigate and hold hearings, either by the full committee or by a subcommittee, to ascertain the extent and success of subversive activities directed against these United States.

"On the basis of these investigations and hearings, the Committee on Un-American Activities reports its findings to the Congress *and makes recommendations from these*

---

1. See H.R.Res. No. 5, 83d Cong., 1st Sess. (1953) adopting provisions of the Legislative Reorganization Act as rules of the 83d Congress.

*investigations and hearings for new legislation. As a result of this committee's investigations and hearings, the Internal Security Act of 1950 was enacted.*

"Over the past fifteen years this committee has been in existence, both as a special and permanent committee, it has made forty-seven recommendations to the Congress to insure proper security against subversion. I am proud to be able to state that of these forty-seven recommendations, all but eight have been acted upon in one way or another. Among these recommendations which the Congress has not acted upon are those which provide that witnesses appearing before congressional committees be granted immunity from prosecution on the information they furnish.

*"The committee has also recommended that evidence secured from confidential devices be admissible in cases involving the national security. The executive branch of Government has now also asked the Congress for such legislation. A study is now being made of various bills dealing with this matter.*

"The Congress has also referred to the House Committee on Un-American Activities a bill which would amend the National Security Act of 1950. This bill, if enacted into law, would provide that the Subversive Activities Control Board should, after suitable hearings and procedures, be empowered to find if certain labor organizations are in fact Communist-controlled action groups. Following this action, such labor groups would not have available the use of the National Labor Relations Board as they now have under the provisions of the Labor-Management Relations Act of 1947.

"During the first session of this 83rd Congress, the House Un-American Activities Committee has held hearings in Los Angeles and San Francisco, California; Albany and New York City, New York; Philadelphia, Pennsylvania, and Columbus, Ohio. We are here in Chicago, Illinois, realizing that this is the center of the great mid-western area of the United States.

"It cannot be said that subversive infiltration has had a greater nor a lesser success in infiltrating this important area. The hearings today are the culmination of an investigation that has been conducted by the committee's competent staff and is a part of the committee's intention for holding hearings in various parts of the country.

"The committee has found that by conducting its investigations and holding hearings in various parts of the country, it has been able to secure a fuller and more comprehensive picture of subversive efforts throughout our nation. Every witness who has been subpoenaed to appear before the committee here in Chicago, as in all hearings conducted by this committee, are known to possess information which will assist the committee in performing its directed function to the Congress of the United States." [Emphasis supplied.]

Later, in April of the same year, at a continuation of the March hearings, the chairman, upon calling the committee to order, announced, just prior to the swearing of appellant [id. at 70]:

"Mr. Velde: The Committee will be in order.

"Let the record show that I have appointed as a subcommittee for the purposes of this hearing Mr. Scherer, Mr. Moulder, Mr. Frazier, and myself as chairman.

"The hearing this morning is a continuation of the hearings which were held in Chicago recently by a subcommittee composed of Mr. Scherer, Mr. Moulder, and myself. At that time two witnesses were unavailable, at least the committee staff were unable to find these two

witnesses to issue a subpoena for them. Subsequent to that time I believe that these witnesses have been subpoenaed, so we will proceed, Mr. Counsel, at the present time with the witnesses."

■ In other words, the purpose of the Committee's hearing was to aid it [the Committee] in its study of a proposed amendment to the Internal Security Act of 1950. That amendment was in fact enacted into law four months after appellant's refusal to testify.[2] It made unavailable to labor unions found to be communist-infiltrated procedures established in the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq. This is a proper example of the exercise of a legitimate legislative purpose.

■ This court's decision in Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied, 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767, as well as the decisions in United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, certiorari denied, 1948, 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122, and Dennis v. United States, 1950, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734, read in the light of Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692, establishes that the contempt statute, 2 U.S.C.A. § 192, when read together with the Committee's authorizing resolution is not so vague or indefinite as to be invalid.

With respect to appellant's claimed protection under the First Amendment, we refer to the Barsky case, supra, where this court indicated that, having power to inquire into the subject of communism and the Communist Party, Congress has the authority to identify individuals who believe in communism and those who belong to the Party, since the nature and scope of the program and ac-

tivities of the Communist Party depend in large measure on the character and number of its adherents. In Barsky we said, 167 F.2d at page 246:

"If Congress has power to inquire into the subjects of Communism and the Communist Party, it has power to identify the individuals who believe in Communism and those who belong to the party. The nature and scope of the program and activities depend in large measure upon the character and number of their adherents. Personnel is part of the subject. Moreover, the accuracy of the information obtained depends in large part upon the knowledge and the attitude of the witness, whether present before the Committee or represented by the testimony of another. We note at this point that the arguments directed to the invalidity of this inquiry under the First Amendment would apply to an inquiry directed to another person as well as to one directed to the individual himself. * * * "

And at page 247 we said:

"Moreover, that the governmental ideology described as Communism and held by the Communist Party is antithetical to the principles which underlie the form of government incorporated in the Federal Constitution and guaranteed by it to the States, is explicit in the basic documents of the two systems; and the view that the former is a potential menace to the latter is held by sufficiently respectable authorities, both judicial and lay, to justify Congressional inquiry into the subject. In fact, the recitations in the opinion of the Supreme Court in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796,

2. The Communist Control Act of 1954 was passed in August 1954, 68 Stat. 775, 50 U.S.C.A. § 841 et seq. (Supp.1955). This contained, among other things, amendments to the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq. and

had to do, in part at least, with infiltration by communists into labor unions. Other changes having to do with communist infiltration into organizations were also included.

are sufficient to justify inquiry. To remain uninformed upon a subject thus represented would be a failure in Congressional responsibility."

■■■ Congress has before it the important duty to legislate effectively, but at the same time wisely, upon the problems posed by the world communist movement. It cannot perform that duty without information. It ought not try to perform it without information. We think the Act authorized an inquiry into infiltration by communists into labor unions and that this inquiry was such an inquiry. The face of the Act seems to us to speak for itself. The inquiry here is likewise plain on its face. It was whether certain persons, members of the union, were indeed communists. The inquiry was specific. It seems to us it was directly part of the inquiry the Committee was directed to make.

■ Points four and five of appellant's statement of errors can be combined for our purposes here. He says the Committee asserted an independent power of exposure. Congress has power of exposure if the exposure is incident to the exercise of a legislative function. Congress certainly has the power of inquiry or of investigation when the inquiry or investigation is upon a subject concerning which Congress may legislate. The fact that such an inquiry or investigation may reveal something or "expose" something is incidental and without effect upon the validity of the inquiry.

■ Appellant would have us judge the present controversy upon the basis of speeches made by members of Congress and others, and upon newspaper articles, etc. We cannot do so. Such material is not evidence. The question is an individual one, whether the inquiry is indeed pertinent to a valid legislative purpose. It cannot be solved by generalities culled from speeches—many of them no doubt partially extemporaneous —or from partisan assailants, critics, friends or defenders of some project or cause. Moreover, even if the unbridled power of exposure were claimed by some members of Congress, the claim would not establish its use in any particular inquiry. We must judge each inquiry in its own setting and upon its own facts.

Appellant cites many authorities, beginning with Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377, to the effect that Congress does not possess the general power of making inquiry into the private affairs of citizens. This point needs no additional exploration. The inquiry here had to do with a valid legislative purpose.

In Young v. United States, 94 U.S. App.D.C. 54, 212 F.2d 236, certiorari denied, 1954, 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137, this court pointed out that a committee, holding a hearing to substantiate an earlier report pertinent to legislation pending before the Congress, was engaged in a legislative function and its competency was not subject to question in a subsequent prosecution. Further in that case we indicated that this legislative purpose for which the subcommittee had convened was not vitiated by the incidental desire of the subcommittee to give interested parties a chance to reply to statements made in such report.

■ Having volunteered an attack on the credibility of a prior witness, appellant could not later refuse to answer questions concerning Communist Party membership of other union associates of appellant and of the prior witness on the ground that this particular phase of testimony was beyond the scope of the Committee's investigating power. Indeed, an inquiry may not only be detailed when credibility is involved but "a legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress." Cf. Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 361, certiorari denied, 1938, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121.

We have examined appellant's other points urged on this appeal and find no

error. The judgment of the District Court is

Affirmed.

BURGER, Circuit Judge, who took office after the hearing and consideration of this case, took no part in its decision.

EDGERTON, Chief Judge, with whom BAZELON, Circuit Judge, joins, dissenting.*

The appellant has been convicted of refusing to answer certain questions before a subcommittee [1] of the Committee of the House of Representatives on Un-American Activities. He told the Committee he had cooperated with the Communist Party from 1942 to 1947. He did not plead the Fifth Amendment. Asked whether he knew certain persons as Communists, he answered freely concerning all whom he believed to be Communists at the time of the hearing. He refused to answer concerning other persons. As the District Court said in sentencing him, he did not "attempt to impede the committee in any respect, other than his refusal to answer questions dealing with persons who, to use his words, 'may in the past have been Communist Party members or otherwise engaged in Communist activities, but who to my best knowledge and belief have long since removed themselves from the Communist movement.'" We have to decide whether his refusal to expose their past history was a crime.

Since 1953 he has been a United Automobile Workers organizer. From 1935 to 1953 he was employed by the International Harvester Company at East Moline, Illinois, but from 1942 to 1953 he was on leave and worked for the Farm Equipment Workers, CIO, and its successor. At a hearing of the Committee in 1952, one Spencer named him as having been a member of the Communist Party between 1943 and 1946. At a

hearing of the Committee in Chicago in March 1954, one Rumsey testified that in 1942 or 1943 Watkins recruited him into the Party and collected his Party dues.

In April 1954, in response to a subpoena, Watkins appeared and testified before the Committee in Washington. He said: "I am not now nor have I ever been a card-carrying member of the Communist Party. Rumsey was wrong when he said I had recruited him into the party, that I had received his dues * * *. Spencer was wrong when he termed any meetings which I attended as closed Communist Party meetings.

"I would like to make it clear that for a period of time from approximately 1942 to 1947 I cooperated with the Communist Party and participated in Communist activities to such a degree that some persons may honestly believe that I was a member of the Party. I have made contributions upon occasions to Communist causes. I have signed petitions for Communist causes. I attended caucuses at an FE convention at which Communist Party officials were present. Since I freely cooperated with the Communist Party I have no motive for making the distinction between cooperation and membership except the simple fact that it is the truth. I never carried a Communist Party card. I never accepted discipline and indeed on several occasions I opposed their position.

"In a special convention held in the summer of 1947 I led the fight for compliance with the Taft-Hartley Act by the FE-CIO International Union. This fight became so bitter that it ended any possibility of future cooperation."

He was asked: "* * * with whom did you participate in the Communist Party in [its] activities * * * ?" He named several people. Mr. Kunzig, Committee counsel, said: "Now, I have here a list of names of people, all of whom were identified as Communist Par-

---

* This opinion is nearly identical with one which, as the majority of a division of the court, we filed January 26, 1956, and which was superseded when a rehearing *in banc* was ordered.

[1]. We shall call the subcommittee the Committee.

ty members by Mr. Rumsey during his recent testimony in Chicago. I am asking you first whether you know these people." He did not know the first three. He knew the fourth, who was Spencer, and the fifth, one Harold Fisher. He was asked, "Do you know Harold Fisher to be a member of the Communist Party?"[2] He consulted his counsel and then read this statement to the Committee: "I would like to get one thing perfectly clear, Mr. Chairman. I am not going to plead the fifth amendment, but I refuse to answer certain questions that I believe are outside the proper scope of your committee's activities. I will answer any questions which this committee puts to me about myself. I will also answer questions about those persons whom I knew to be members of the Communist Party and who I believe still are. I will not, however, answer any questions with respect to others with whom I associated in the past. I do not believe that any law in this country requires me to testify about persons who may in the past have been Communist Party members or otherwise engaged in Communist Party activity but who to my best knowledge and belief have long since removed themselves from the Communist movement.

"I do not believe that such questions are relevant to the work of this committee nor do I believe that this committee has the right to undertake the public exposure of persons because of their past activities. I may be wrong, and the committee may have this power, but until and unless a court of law so holds and directs me to answer, I most firmly refuse to discuss the political activities of my past associates."

After testifying that Joseph Stern, one of the men on the Committee's list, had carried on Party activities, he said: "In regard to the other names that you have read, I will not answer, based upon the statement that I read into the record * * *." The Committee directed him to answer. He refused again. The Committee did not question him further.

He was indicted in November 1954 and tried in May 1955. He waived a jury. The government called only one witness, the Committee counsel, who put into the record the transcript of the Committee's examination of Watkins. The court found Watkins guilty, fined him $500, sentenced him to a year's imprisonment, suspended the sentence, and placed him on probation.

## I

The Committee on Un-American Activities is a standing committee of the House of Representatives. The Committee and its subcommittees are authorized by an Act of Congress "to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." 60 Stat. 812, 823, 828.

A witness before a congressional committee is guilty of a misdemeanor if he "refuses to answer any question perti-

2. As to all except Fisher and one other, the Committee's questions were expressly about past Party membership. As to those two persons, the questions were phrased in the present tense. But in view of the earlier testimony of Rumsey and Spencer, who set the dates of appellant's Party affiliation from 1943–46, and appellant's uncontradicted statement that he had ceased cooperation with the Party in 1947, it is plain that the Committee was questioning appellant about the past. He did not refuse to testify about the present. His statement which we proceed to quote shows that when he replied to a question about present membership by standing on the statement, he was in effect denying that he knew the named individual to be a present member of the Party and refusing to answer about past membership.

nent to the question under inquiry * * *." 2 U.S.C.A. § 192, R.S. § 102, 52 Stat. 942, as amended. Pertinence is part of the government's case. In order to convict, the government must plead and prove that the questions the witness would not answer were pertinent to an inquiry Congress had authorized. Sinclair v. United States, 279 U.S. 263, 296–297, 49 S.Ct. 268, 73 L.Ed. 692; Bowers v. United States, 92 U.S.App.D.C. 79, 80, 202 F.2d 447, 448; Keeney v. United States, 94 U.S.App.D.C. 366, 369, 218 F.2d 843, 845.

An important preliminary question is whether the authorizing Act is to be construed broadly or narrowly for the purpose of deciding whether the questions Watkins would not answer were pertinent to the inquiry authorized. The Act must be construed narrowly if a narrow construction avoids a serious constitutional question. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770.

If the questions Watkins would not answer were pertinent to the inquiry authorized by the Act, we should have to decide whether they were within the constitutional power of Congress. Like the question in the Rumely case, this question is serious, as we shall presently show. It follows that, for the purposes of this case, the Act must be construed narrowly if the questions Watkins refused to answer would otherwise appear pertinent.

"There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation. This power * * * is indeed co-extensive with the power to legislate. * * * *It cannot be used to inquire into private affairs unrelated to a valid legislative purpose.* Nor does it extend to an area in which Congress is forbidden to legislate. Similarly, the *power to investigate must not be confused with any of the powers of law enforcement;* those powers are assigned under our Constitution to the Executive and the Judiciary. Still further limitations on the power to investigate are found in the specific individual guarantees of the Bill of Rights, such as the Fifth Amendment's privilege against self-incrimination * * *." Quinn v. United States, 1955, 349 U.S. 155, 160, 161, 75 S.Ct. 668, 672, 99 L.Ed. 964. (Emphasis added.)

The only limitation dealt with in the Quinn case was the privilege against self-incrimination. The fact that the Supreme Court called attention to other limitations, including the necessity of a "valid legislative purpose", suggests that the Court shares the "wide concern, both in and out of Congress, over some aspects of the exercise of the congressional power of investigation." United States v. Rumely, 345 U.S. 41, 44, 73 S.Ct. 543, 545.

It is very questionable whether exposure of individuals to public contempt or hostility is a "valid legislative purpose". Since Congress has "no powers of law enforcement" it would have no power, in the absence of a valid legislative purpose, to expose former Communists, even if there were a law requiring that forer Communists be exposed. If we were obliged to decide what the Committee's purpose was in asking the questions Watkins would not answer, we might be forced to conclude that the Committee asked them for the sole purpose of exposure.

By "exposure" we mean injurious publicity. The fact that Rumsey, at Chicago in March, publicly called Fisher a Communist, does not mean that if Watkins had done so at Washington in April, this new publicity and its repetition in and out of the press would not have been injurious. Obviously the new publicity would have been injurious. As the law of slander and libel recognizes, the fact that a derogatory statement has been made previously does not make it harmless. And the fact that Rumsey had called Fisher a Communist does not show that the Committee sought to serve some other purpose than injurious publicity when it asked Watkins "Do you know Harold Fisher to be a member of the Communist Party?"

## II

The government argues that the Committee's purpose in asking the questions was to investigate Communist infiltration of labor unions, in order to determine the need for pending legislation to deprive Communist-infiltrated unions of the use of the National Labor Relations Board.[3] But several aspects of the Committee's examination of Watkins tend to show that the Committee did not ask these questions for that purpose, or for any purpose except exposure.

(1) The Committee made no attempt to learn from Watkins either the total number of Communists in his union, or what positions Communists held in the union, or whether or how, or how far, or in what direction, they influenced the union. The Committee showed no interest in anything but a list of names. Whether Communist infiltration of unions creates a need for legislation would seem to depend on the number, and the nature, extent, and effectiveness of the activities, of Communists in unions. Watkins named several people, who apparently had been fellow-members of his union, as having been Communists while he cooperated with the Party. If the Committee had been questioning him for a legislative purpose, it could hardly have failed to question him about what, if anything, these Communist members of the union did.

(2) It is not clear, and the government does not suggest, how the questions Watkins would not answer could have served the purpose the government now attributes to the Committee.

These questions concerned the presence of Communists in a union between 1942 and 1947. Their presence or absence in unions then had little or nothing to do with the question whether, at the time of the Committee hearing in 1954, Communists in unions were so numerous, so active, and so effective as to create problems that called for legislation. This is true partly because of the lapse of time, but chiefly because times had changed and legislation had changed.

Communist affiliation betwen 1942 and 1947 did not mean what Communist affiliation meant in 1954. In December 1941 the United States joined Russia in the war against Germany. President Roosevelt wrote to Admiral Land in January 1942: "I am still terribly disturbed about the fact that an adequate number of ships are not available for Russia. * * * This Government has made a firm pledge to Russia and we simply cannot go back on it." In February 1942 General MacArthur honored the 25th anniversary of the Red Army with a message in which he said: " * * * the hopes of civilization rest upon the worthy banners of the courageous Russian Army. * * * "[4] Friendly relations between the United States and Russia continued throughout the war and did not cease immediately at the end of the war.

3. In opening the hearing in Washington at which Watkins testified, on April 29, 1954, the chairman said nothing directly about purpose. He said: "The hearing this morning is a continuation of the hearings which were held in Chicago recently * * *." In opening the Chicago hearings, in March 1954, the chairman said Congress had directed the Committee "to ascertain the extent and success of subversive activities directed against these United States", and mentioned bills of two sorts as pending before the Committee, one of which would make evidence "secured from confidential devices" admissible in "cases involving the national security". Another, he said, "would provide that the Subversive Activities Control Board should, after suitable hearings and procedures, be empowered to find if certain labor organizations are in fact Communist-controlled action groups. Following this action, such labor groups would not have available the use of the National Labor Relations Board as they now have under the provisions of the Labor-Management Relations Act of 1947."

4. Quoted in Robert E. Sherwood, Roosevelt and Hopkins, p. 496, 497 (1948).

The Labor Management Relations Act, which requires non-Communist affidavits from officers of unions that use the National Labor Relations Board, was not passed until 1947, close to the end of the period to which the Committee's questions relate. Whether the Act is adequate or requires strengthening would seem to depend upon what has happened since, not what had already happened. Likewise the Internal Security Act and the Immigration and Nationality Act, passed in 1950 and 1952, were in effect at the time of the Committee hearing but not at the time to which the Committee's questions relate.[5]

(3) When Watkins refused to answer the Committee's questions, saying he thought their purpose was "public exposure of persons because of their past activities", the Committee was under no obligation to reply. However, the chairman chose to reply. His reply did not suggest that the questions had a legislative purpose related to unions. It did not mention unions. Instead, it claimed for the Committee unlimited authority to question Watkins concerning his knowledge of former Communists. The chairman said: "This committee is set up by the House of Representatives to investigate subversion and subversive propaganda and to report to the House of Representatives for the purpose of remedial legislation. The House of Representatives has by a very clear majority, a very large majority, directed us to engage in that type of work, and so we do, as a committee of the House of Representatives, have the authority, the jurisdiction, to ask you concerning your activities in the Communist Party, concerning your knowledge of any other persons who are members of the Communist Party or who have been members of the Communist Party, and so, Mr. Watkins, you are directed to answer the question propounded to you by counsel."

(4) The Committee seems to have had in its possession, before it questioned Watkins, the information about other persons which it asked him to supply.[5a]

(5) The purpose the government attributes to the Committee, and practically any other purpose except exposure, might have been served by questioning Watkins in a closed session. But the Committee questioned him at a public hearing.

### III

Words and conduct of the Committee on other occasions go far to confirm the inference that its purpose on this occasion was exposure.

"The Committee and its members have repeatedly said in terms or in effect that its main purpose is to do by exposure and publicity what it believes may not validly be done by legislation." [5b]

At the trial, the defense offered in evidence "excerpts from House committee reports, House committee hearings, Congressional Record statements and newspapers, going to the point that the House committee asserts an independent power all apart from legislation to expose persons to public knowledge." The court excluded these excerpts as evidence, but they are in the record as an offer of proof. They cover some 64 printed pages.[6] They show beyond doubt, and it is not disputed, that the Committee on

---

5. 64 Stat. 987, 50 U.S.C.A. § 781 et seq.; 66 Stat. 163, 8 U.S.C.A. § 1101 et seq. The Communist Control Act of 1954 is not pertinent in this connection, since it was passed in August 1954, after the Committee hearing. 68 Stat. 775.

5a. Cf. Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637.

5b. Dissenting opinion in Barsky v. United States, 83 U.S.App.D.C. 127, 142, 167 F.2d 241, 256. A footnote quotes many such statements.

6. Counsel stipulated that the excerpts from official sources are accurate and that those from newspapers are "true and correct quotations, digests or reports as the case may be of the statements and events reported therein."

Un-American Activities claims an independent power of exposure and sometimes investigates for the purpose of exposure. We give a few illustrations.

Mr. Dies, the first chairman of the Committee, said during debate in the House on his resolution for the appointment of such a Committee, "I am not in a position to say whether we can legislate effectively in reference to this matter, but I do know that exposure in a democracy of subversive activities is the most effective weapon that we have in our possession." [7]

The Committee said in 1951: "Exposure in a systematic way began with the formation of the House Committee on Un-American Activities, May 26, 1938. * * * The House Committee on Un-American Activities was started on its way May 20, 1938, with instructions from the United States House of Representatives to expose people and organizations attempting to destroy this country. That is still its job, and to that job it sticks." [8]

Mr. Velde, the Chairman of the Committee in the 83d Congress, who presided at the Watkins hearing, said at another hearing: "we feel that we have a duty and that duty has been imposed upon us by Congress not only to report to Congress for the purpose of remedial legislation but to inform the people who elected us about subversive activities. * * * * " [9]

Chairman Walter said in 1955: "Unlike most congressional committees, in addition to the legislative function we are required to make the American people aware if possible of the extent of the infiltration of Communism in all phases of our society." [10]

The Committee has publicized the names of persons identified to it as Communists or former Communists. Its Report for 1952 devotes 54 out of a total of 89 pages to the names and addresses of such persons. Its Report for 1953 devotes 59 out of 193 pages to a similar list.

Though the Committee's Report for 1954, the year of the Watkins hearing, does not contain a list of names, it points to exposure as the Committee's function. It says, e. g., that in 1952 the Committee "reported that during its investigation the identity of over 600 individuals as Communist Party members was obtained. * * * During the committee's investigation, it uncovered members of the Communist Party holding influential positions in the school systems of Detroit and other communities. * * * Most of the teachers called have been suspended or permanently removed from their positions. The Committee on Un-American Activities approves of this action * * *." [11] In a separate pamphlet issued in 1954 the Committee said: "This committee and the special committee have over the past 16 years held hundreds of hearings and issued and distributed throughout the United States hundreds of thousands of reports exposing the operations of the Communist Party and its fronts." [12]

The District Court ruled that express claims of an independent power of exposure, made without particular reference to the Watkins hearing, do not tend to prove that the Committee's purpose in the Watkins hearing was exposure. In

---

7. 83 Cong.Rec. 7570 (May 26, 1938). Quoted in Robert K. Carr, The House Committee on Un-American Activities (1952) at p. 15.

8. 100 Things You Should Know About Communism (1951), 82d Cong., 1st Sess., House Document No. 136, pp. 19, 67.

9. Hearing Before the Committee on Un-American Activities, House of Representatives, 83d Cong., 1st Sess., p. 1106.

10. U. S. News and World Report, August 26, 1955, p. 71.

11. Committee on Un-American Activities, Annual Report for the Year 1954, pp. 14-15, 17.

12. This is YOUR House Committee on Un-American Activities, p. 25.

our opinion this was error. Although general propositions do not decide concrete cases, they help to decide them. Intentions tend to result in acts. By claiming that it had the authority and duty to expose, the Committee implied that it intended to expose. And as the Fifth Circuit recently said, "of course it may be inferred from a person's statement that he intended to do something, that he later actually did it. Mutual Life Ins. Co. of New York v. Hillmon, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706." Shurman v. United States, 1955, 219 F.2d 282, 290, footnote 9.[13]

## IV

In our opinion the questions Watkins refused to answer are not pertinent to the inquiry authorized by the Act, even if the Act is not construed narrowly. If it is construed narrowly, the questions are clearly not pertinent.

The key words of the Act are (i) "extent, character and objects of un-American propaganda activities"; (ii) "diffusion * * * of subversive and un-American propaganda"; and (iii) "questions in relation thereto that would aid Congress in any necessary remedial legislation." The questions do not relate in any clear or direct way to the extent, the character, the objects, or the diffusion, of any propaganda, subversive and un-American or otherwise. The government has not shown that in asking these questions the Committee was seeking, even indirectly, information about the extent or character or objects or diffusion of propaganda. It has not shown that Watkins, or his union, or the persons about whom the Committee in-

quired, engaged in propaganda, or that the Committee sought to learn whether they did.

As to clause (iii) of the Act: possibly questions concerning Communist Party membership might be considered "questions in relation" to the "extent, character and objects" or the "diffusion" of propaganda, if the phrase "in relation" were construed very broadly, but these questions certainly cannot be so considered if the phrase is construed narrowly. Moreover, clause (iii) contains the further requirement that the questions "would aid Congress in any necessary remedial legislation". If a mere theoretical chance of very slight aid were to be considered sufficient, possibly it might be thought that the questions "would aid". But that would be a broad construction of those words. Construed narrowly, the words require more than a theoretical chance. The questions Watkins would not answer plainly do not meet this requirement.

"The United States suggests that the presumption of regularity is sufficient without proof. But, without determining whether that presumption is applicable to such a matter, it is enough to say that the stronger presumption of innocence attended the accused at the trial." Sinclair v. United States, 279 U.S. 263, 296, 49 S.Ct. 268, 273. We conclude that the government failed to show, either beyond a reasonable doubt or even by a preponderance of the evidence, that the questions Watkins would not answer were pertinent to any investigation the Committee was authorized to make.

Barsky v. United States, 83 U.S.App. D.C. 127, 167 F.2d 241, is not to the

13. Morford v. United States, 85 U.S.App. D.C. 172, 176 F.2d 54, 56, reversed on other grounds, 339 U.S. 258, 70 S.Ct. 586, 94·L.Ed. 815, is not to the contrary. Morford refused to give the Committee on Un-American Activities the financial records, and the names of the publications committee, of the National Council of American-Soviet Friendship, which had put out "a flood of propaganda * * * of the nature described in the Resolution". Unlike this case, the Com-

mittee's questions were clearly pertinent to its authorized investigation and nothing in its examination of the witness suggested that it did not ask the questions for that purpose. The presumption of a legislative purpose, which resulted, "cannot be rebutted by impugning the motives of · individual members of the Committee." 85 U.S.App.D.C. at page 176, 176 F.2d at page 58. No one's motives are impugned by showing the Committee's concept of its duty.

contrary. The court held that, in the circumstances of that case, Congress and the Committee on Un-American Activities had "power to make an inquiry of an individual which may elicit the answer that the witness is a believer in Communism or a member of the Communist Party." 83 U.S.App.D.C. at page 136, 167 F.2d at page 250. But the circumstances of that case and of this are very different. (1) As the court pointed out, Barsky and his co-defendants "were not asked to state their political opinions. They were asked to account for funds". 83 U.S.App.D.C. at page 130, 167 F.2d at page 244. (2) As the court pointed out, the Congressional Committee had been informed that Barsky's organization, the Joint Anti-Fascist Refugee Committee, was engaged in "political propaganda". 83 U.S.App. D.C. at page 129, 167 F.2d at page 243. It has not been shown that the Congressional Committee had any comparable information in this case. (3) The question Barsky refused to answer related, though indirectly, to his *present* Communist membership. The questions Watkins refused to answer related to Communist membership of other persons at a time long past. To hold, as Barsky does, that the Committee may inquire whether members of an organization shown to engage in propaganda are now Communists, does not imply that it may inquire whether members of a union not shown to engage, or to be likely to engage, in propaganda were once Communists.[14]

We need not consider appellant's other contentions.

14. In Lawson v. United States, 85 U.S. App.D.C. 167, 176 F.2d 49, the Committee asked each of two "prominent writers" in the motion picture industry "whether or not he was or had ever been a member of the Communist Party". Though this question included past as well as present membership, neither the briefs nor the opinion of the court show consideration of the fact. The court's ruling, as expressed, is limited to questions regarding *present* membership: "we expressly hold herein that the House Committee on Un-American Activities, or a properly appointed subcommittee thereof, has the *power* to inquire whether a witness subpoenaed by it is or is not a member of the Communist Party or a believer in Communism * * *." The court held that since motion pictures "are, or are capable of being, a potent medium of propaganda dissemination", the question was pertinent. 85 U.S.App.D.C. at pages 170, 171, 176 F.2d at pages 52, 53.