**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**WASHINGTON WATER POWER COMPANY, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jeremiah P. BUCKLEY,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ellsworth B. SARGENT,**
**Defendant-Appellant.**

**Nos. 84–3047 to 84–3049.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1985.

Decided July 8, 1986.

As Amended Sept. 16, 1986.

Steve Schroeder, Asst. U.S. Atty., Seattle, Wash., for U.S.

Arthur W. Harrigan, Jr., Lane, Powell, Moss & Miller, Seattle, Wash., for Washington Water & Power.

William A. Helsell, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Buckley.

William G. Goodwin, Montgomery, Purdue, Blankinship & Austin, Malcolm L. Edwards, Edwards & Barbieri, Seattle, Wash., for Sargent.

Before WRIGHT and REINHARDT, Circuit Judges, and TAYLOR,[*] District Judge.

REINHARDT, Circuit Judge:

## I. INTRODUCTION

On January 22, 1981, a federal grand jury in Seattle, Washington, indicted Washington Water Power Company (WWPC), Jeremiah P. Buckley, who was a lobbyist for WWPC, Sargent-Tyee Construction Company, and Ellsworth B. Sargent, president of Sargent-Tyee.

Count I of the indictment charged that all defendants had committed mail fraud in violation of 18 U.S.C. § 1341. Count II charged that Buckley and WWPC had obstructed justice in violation of 18 U.S.C. § 1503. On August 25, 1981 the district court dismissed Count I on the ground that

---

[*] Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

it alleged insufficient facts to support a charge of mail fraud.

In *United States v. Buckley,* 689 F.2d 893 (9th Cir.1982), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983), we reversed the district court. Although we found the indictment "lengthy, confusing, and largely irrelevant," 689 F.2d at 899, we held that the government had adequately alleged a violation of the mail fraud statute. We also noted that the government's case appeared rather weak, but stated that "the weakness of the [g]overnment's case is irrelevant to the sufficiency of the indictment." *Id.* at 900.

The case proceeded to trial on January 30, 1984. On February 27, at the close of the government's case, Sargent-Tyee Construction Company was severed as a defendant upon agreeing to abide by the result by means of a plea if the other defendants were found guilty. On March 13, 1984, the jury returned verdicts of guilty on Count I as to the three remaining defendants, and guilty on Count II as to both Buckley and WWPC. All three defendants timely appealed, raising several challenges to each of the convictions.

## II. COUNT I—MAIL FRAUD

### A. *Background*

The government alleged that the various defendants and Robert Perry, who at the time was the majority leader of the Washington State House of Representatives,[1] engaged in a complicated scheme in which a percentage of the proceeds that WWPC paid to Sargent-Tyee Construction Compa-

ny on various construction contracts was laundered in Hong Kong and then "kicked back" to WWPC for use in making improper payments to politicians in the State of Washington. Perry allegedly was the intermediary between WWPC and Sargent-Tyee, and was involved in various other "kick-back" schemes involving the laundering of money in Hong Kong.

In particular, the government charged that $15,000 was collected by WWPC through the "kick-back" scheme in the spring of 1975 and was used to make a political payment to one or more members of the Washington State Legislature. This payment was allegedly not reported on the Washington State Public Disclosure Commission Form L–3, Lobbyist Employer's Report, that WWPC mailed to the Public Disclosure Commission in April, 1976. A failure to disclose is a violation of Washington Revised Code § 42.17.010 *et seq.* We have previously held that the mailing of such a form may make the federal mail fraud statute, 18 U.S.C. § 1341 (1982), applicable.[2] *Buckley,* 689 F.2d at 897–900.

The defendants raise several challenges to their convictions for mail fraud. The first is that there was not sufficient evidence to support a conviction. In considering such a challenge to the verdict, we must determine whether upon the "evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979).

---

**1.** In addition to being the majority leader, Perry was also the first chairman of the Washington State House of Representatives Ethics Committee.

**2.** 18 U.S.C. § 1341 (1982) provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counter-

feit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned for not more than five years, or both.

## B. *Sufficiency of the Evidence*

In order for a jury ultimately to have found that the defendants violated section 1341, it must first have found that the Form L-3 filed by WWPC in April, 1976, was false. *Buckley,* 689 F.2d at 898-99. The Form L-3 was false only if it failed to list payments to legislators that were made during 1975. Accordingly, the convictions under section 1341 can be sustained only if a rational trier of fact could have found that the defendants made payments to Washington State legislators during 1975 that were not reported.

 The government concedes that it has no direct evidence of any unreported payments, but argues that there is sufficient circumstantial evidence of such payments. The prosecution's first claim is that the evidence showing that the defendants assembled $15,000 in laundered funds and that Buckley told Perry he intended to make a payment is, without more, sufficient to support a finding that at least one such payment was actually made. We reject this contention.

 The prosecution's evidence *might* support a conviction for conspiring to make an unreported payment, but that offense was not charged. The government's argument would erase the dividing line between a conspiracy or an attempt, and the substantive offense. Instead of there being three distinct crimes, there would be only one. Under the government's theory, the planning of a crime would constitute the commission of the crime itself. This result would run counter to a fundamental concept that underlies our criminal justice system. Until an individual actually commits an offense, he is innocent. Thinking about perpetrating a crime is not unlawful. The

3. One commits the offense of conspiracy when one goes beyond individual planning and enters into an unlawful agreement with another person. In conspiracy cases, however, there is another requirement in addition to the making of an unlawful agreement. There must also be the taking of a concrete step toward carrying out that agreement—an overt act.

4. We do not here question the continuing vitality of the *Hillmon* doctrine, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1895), which holds that evidence of intent to commit an act is admissible to

evil lies in the commission of the illegal act. Prior to the time one actually crosses the line and acts, there is always the possibility that conscience, civic responsibility or plain good judgment will prevail.[3] The government's evidence concerning the assembling of $15,000 in laundered funds and its evidence regarding Buckley's intent is insufficient as a matter of law to support the convictions for violating section 1341.[4]

 The government's second claim is that the "unusual circumstances" surrounding the passage of Substitute House Bill 435 by the Washington State Senate in June, 1975, provide sufficient circumstantial evidence that the defendants made at least one unreported payment.

The prosecution introduced evidence which established the following facts. Substitute House Bill 435 provided for certain changes in public utility rate-making procedures, changes that would have financially benefited public utilities, including WWPC. The bill was being considered by the Washington State Senate in the closing days of a special legislative session. On June 7, 1975, a senator who opposed the bill challenged the advancement of the bill from the second reading to the third reading. Another senator moved that the rules be suspended so that the bill could be advanced. Senator Mardesich, the majority leader of the Senate, spoke in favor of the motion, which then passed 33 to 16. The 33 votes were precisely the number required. Senator Mardesich voted for the motion, although the 16 votes opposing it were all cast by members of Senator Mardesich's party. The senator who originally objected was also a member of Senator Mardesich's party. Later that day the bill was read for the third time and given

prove commission of the act itself. *See* Fed.Rule Evid. 803(3), advisory committee note; *United States v. Astorga-Torres,* 682 F.2d 1331, 1335-36 (9th Cir.) *cert. denied,* 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982). Whether such evidence of intent, standing alone, or with only meager indirect evidence, is sufficient to support a finding that the act occurred is a wholly separate issue. *See, e.g., United States v. Moore,* 571 F.2d 76, 82 (2d Cir.1978); McCormick on Evidence § 295 at 851 (3d ed. 1984).

final approval by a vote of 25 to 24. The 25 votes were exactly the number required. Senator Mardesich voted against the bill.

The government argues that the Senate's passage of the bill was "unusual" because Senator Mardesich provided the deciding vote that allowed the bill to advance to the third reading, even though all the opposition to the bill's advancement came from members of his own party. Thus, the government continues, given the evidence that the defendants intended to pay off a legislator and that the passage of the bill would have benefited the defendants, they must have made a payment to Senator Mardesich.

The government's evidence is clearly insufficient to support a conviction. No rational trier of fact could have found beyond a reasonable doubt that Senator Mardesich's conduct demonstrates that he received a bribe, even assuming the truth of all the other evidence offered by the government regarding the laundering of funds by the defendants. Moreover, a close examination of all the undisputed evidence relating to the Senator's vote renders the government's argument wholly untenable, if not unconscionable.

First, the government's own witness, a former legislator and chairman of the Washington State Utilities and Transportation Commission, stated that what was "unusual" about the passage of Substitute House Bill 435 was the fact that any senator had objected to its advancement to the third reading. The witness did not state that there was anything else unusual about the bill.

Second, the government in its argument has ignored the undisputed facts that provide the reason for Senator Mardesich's support of the motion to suspend the rules and allow the bill to advance. During the debate on the motion, Senator Mardesich announced that he opposed the bill. He pointed out that Senator Keefe of Spokane, who was a strong supporter of the bill, was seriously ill with cancer and was scheduled to go to the hospital that day for extended

treatment. He told his colleagues that Senator Keefe had stated that he was unwilling to go to the hospital until after the final vote on the bill. Senator Mardesich told the Senate that he believed Senator Keefe should be in the hospital receiving treatment, and that he would, therefore, support the motion to advance the bill, so that Senator Keefe could vote on final passage and still get to the hospital on time. Senator Mardesich also noted that even if the bill were not advanced that day, it would still be read for the third time in a day or two. Thus, Senator Mardesich concluded, a vote against advancement was merely delaying the inevitable, while a vote for advancement would allow Senator Keefe to enter the hospital for treatment promptly.

At the trial, the government did not introduce any evidence that cast any doubt on the statements made by Senator Mardesich during the debate on the motion to advance Substitute House Bill 435. Nor, when questioned at oral argument did it suggest that Senator Mardesich's statements in explanation of his vote were untrue or inaccurate in any respect. In addition to Senator Mardisich, thirteen senators who were members of Senator Mardesich's party voted to advance the bill. Seven other senators besides Senator Mardesich voted to advance the bill and then voted to oppose it on final passage. Accordingly, no rational juror would have had reason to find that Senator Mardesich did anything other than support the advancement of the bill out of senatorial courtesy to, if not compassion for, his cancer-stricken colleague. Certainly no rational juror could have found that his support was a result of his having received a bribe from WWPC or anyone else.

Having rejected both of the government's arguments, we conclude that there is insufficient evidence to uphold the defendants' conviction on Count I. Accordingly, the convictions of Buckley, Sargent, and WWPC on Count I are reversed.[5]

5. Thus, we need not address the defendants' other challenges to their convictions on Count I.

## III. COUNT II—OBSTRUCTION OF JUSTICE

### A. *Background*

Defendants WWPC and Buckley were also convicted of violating the so-called "omnibus clause" of 18 U.S.C. § 1503 (1976), which then provided:[6]

> Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Perry testified that in early June 1977, he approached Buckley and asked him to make arrangements for a job outside of the United States so that he, Perry, could not be subpoenaed in the case of Robert Gulino, a former Seattle City Engineer. Gulino had been indicted by a federal grand jury on May 31, 1977 and charged with lying to the grand jury that was investigating an unrelated kick-back scheme that Gulino and Perry were said to have operated in the early 1970's. The 1970's scheme allegedly involved the West Seattle Bridge project. The only connection between the scheme charged in Count I of this case, and the alleged corrupt activities surrounding the West Seattle Bridge project was that, supposedly, Perry had participated in both ventures and the same money launderer was used.

Perry said that he told Buckley that if he were subpoenaed to testify in the Gulino case he would "tell all," and thus that it would be to Buckley's and WWPC's advantage if Perry were to be outside the United States. Buckley then talked to the Presi-dent of WWPC, who made a telephone call to the head of a major construction company. As a result of the call Perry was ultimately hired by the construction company to supervise work on a project in Mexico. Perry left the United States shortly before a subpoena could be served on him and did not testify at the Gulino trial.

On appeal, Buckley and WWPC raise a variety of challenges to their convictions.

### B. *Analysis*

The defendants' first argument is that there was insufficient evidence to show that they knew that Perry was a witness in a pending federal proceeding. A violation of section 1503 requires a showing that the defendants had knowledge that a federal proceeding was pending. *United States v. Baker*, 494 F.2d 1262, 1265 (6th Cir.1974); *but see United States v. Ardito*, 782 F.2d 358, 361 (2d Cir.) (government need not show that defendant knew proceedings were federal, but only that they were judicial), *cert. denied*, — U.S. —, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986). In a case involving interference or tampering with a witness, it must also be shown that the defendants knew that the person was "expect[ed] to be called to testify." *United States v. Jackson*, 513 F.2d 456, 459 (D.C.Cir.1975).

We have previously held that a federal proceeding is "pending" for purposes of section 1503 as soon as a complaint has been filed with a magistrate. *United States v. Metcalf*, 435 F.2d 754, 756 (9th Cir.1970). Under current criminal procedure, an indictment or information must be brought against the accused even if a complaint is filed. 1 C. Wright, *Federal Prac-*

---

Included in the issues we need not consider are the defendants' claims that the government improperly delayed in turning over certain documents, that the district court erred in failing to order the production of certain Internal Revenue Service documents, and that the district court erred in not ordering the production of certain tapes and transcripts in the possession of a Seattle newspaper. With respect to this last claim, it is clear from the briefs that the defendants' arguments on the matter are addressed to Count I only. We have reviewed the parties'

legal analysis on this point, however, and even if we were to construe the defendants' briefs as contending that the tapes and transcripts were relevant to Count II, we would affirm the ruling of the district court.

**6.** Section 1503 has subsequently been amended. *See* the Victim and Witness Protection Act of 1982, § 4(c), Pub.L. No. 97–291, 96 Stat. 1248, 1253 (1982).

tice & Procedure: Criminal § 121 at 338 (2d ed. 1982). Furthermore, an indictment can be brought in lieu of filing a complaint. 1 Wright, *supra*, § 41 at 31. Thus, it is clear that a federal proceeding is "pending" for purposes of section 1503 once an indictment has been issued.

Gulino was indicted on May 31, 1977. Perry spoke to Buckley in early June. While Perry's testimony as to what he said at this meeting is not entirely clear, a rational trier of fact could certainly have found that Perry told Buckley either that Gulino had been indicted or that Gulino would be tried soon. A rational trier of fact could certainly have found beyond a reasonable doubt that the defendants knew that a federal proceeding was pending. It is also quite clear that a rational jury could have found that Buckley knew that Perry was expected to be a witness at the Gulino trial. Accordingly, there was sufficient evidence of the required knowledge on the part of the defendants. *See Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979).

■ The defendants' second argument is that section 1503 applies only to cases in which a defendant improperly induces a witness not to testify, but does not apply to cases in which the witness asks a defendant to aid him in an attempt to avoid testifying. We have previously rejected this contention. In *United States v. Lester*, 749 F.2d 1288, 1293 (9th Cir.1984), we noted that "this court consistently has rejected the argument that the omnibus provision [of section 1503] covers only activities obstructing justice that involve force, threats, or intimidation ... This provision includes noncoercive witness tampering." (citations omitted). In other words, section 1503 applies when "it is not the witness but the 'administration of justice' that stands in need of protection." *Id.* at 1295. In *Lester*, we assumed that the defendants had merely aided a witness in going into hiding in order to avoid testifying, and that there had been no intimidation or harassment, but we still concluded that section 1503 had

been violated. *Id.* Accordingly, we must reject defendants' claim here.

■ The defendants' third argument is that a violation of section 1503 requires a showing that the defendants actually impeded justice and no such showing was made. Defendants' legal argument is incorrect. It is well-established law in this circuit that "it is not necessary to show that a defendant actually obstructed justice ... the statutory focus is on an endeavor." *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985). Moreover, defendants' factual argument is equally incorrect. Defendants argue that no "obstruction" could have occurred because "all inferences" are that Perry would have invoked his Fifth Amendment privilege against self-incrimination had he not left the country. However, there was testimony at trial, that a reasonable jury could have believed, that Perry told Buckley he would "tell all" if he were subpoenaed to testify in the Gulino case. Thus, we must reject defendant's third argument as well.

The defendants' fourth and final argument is that the jury instructions were incorrect. This claim is essentially a restatement of the first three claims, in that the defendants argue that the jury instructions did not reflect their legal theories as to the meaning and requirements of section 1503. Because we have rejected the defendants' theories regarding section 1503, we reject their claim that the jury instructions were erroneous.

The convictions of Buckley and WWPC under Count II for obstruction of justice are affirmed.

## IV. CONCLUSION

Because there is insufficient evidence, the defendants' convictions on Count I are reversed. The convictions of WWPC and Buckley on Count II are affirmed.

REVERSED IN PART AND AFFIRMED IN PART.