TASHIMA, Circuit Judge,
dissenting:
To paraphrase a famous line, in this case, the government has concluded that it is not for it to say what offense Hamid Hayat has committed, but it is satisfied that he committed some offense, for which he should be punished.[1] This case is a stark demonstration of the unsettling and untoward consequences of the government’s use of anticipatory prosecution as a weapon in the “war on terrorism.” E.g., Robert M. Chesney, Beyond Conspiracy? Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism, 80 S. Cal.L.Rev. 425, 491 (2007) (describing the 18 U.S.C. § 2339A charge against Hayat “as a sweeping form of individual inchoate crime liability”). In an anticipatory prosecution, the government “proceed[s] on an inchoate crime theory based on the harmful conduct that the government anticipates the person might commit.” Id. at 447. The goal is to catch and punish suspects for crimes, such as the material support statute at issue here, to prevent as yet unplanned acts of terrorism the government asserts the suspect would have tried to commit had he not been prevented.
Hayat does not directly challenge this strategy of anticipatory prosecution; its propriety, therefore, is not before this court. Nevertheless, “the primary constitutional duty of the Judicial branch [is] to do justice in criminal prosecutions.” United States v. Nixon, 418 U.S. 683, 707, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Bull v. City & Cnty. of S.F., 595 F.3d 964, 1004 (9th Cir.2010) (en banc) (Thomas, J., dissenting) (“Our constitutional oath requires us to do justice — not injustice — without respect to persons.”). Scrupulous fulfilment of this duty is all the more critical when the government asks a jury to deprive a man of his liberty largely based on dire, but vague, predictions that he might commit unspecified crimes in the future. Because this duty was not fulfilled in Hayat’s trial, I would reverse the conviction and remand for a new trial. I therefore respectfully dissent.
I
The government’s theory is that Hamid Hayat, the American-born, erstwhile agricultural worker son of an immigrant ice-cream truck driver in rural Lodi, California, attended a terrorist training camp in Pakistan and returned to the United States with a “jihadi heart” and a “jihadi mind,” intending to commit terrorist acts of some unknown sort at some unknown time in the future. The evidence against Hayat is as follows:
His maternal grandfather runs a religious school in Pakistan. Hayat expressed repugnant views about the murder of American journalist Daniel Pearl. He kept a scrapbook of news articles about Pakistani politics and Islamic fundamentalism, including anti-American commentary. In conversations with a government informant, he expressed interest in going to, and then made excuses for not attending, a terrorist training camp. After hours of questioning, beginning around 11:00 a.m., *905 and lasting into the early morning hours of the following day, he finally agreed with FBI interrogators, who repeatedly insisted, despite his continuing denials, that Hayat had in fact attended such a training camp. Finally, Hayat carried in his wallet a written prayer, a saying of the prophet Mohammed, that a government expert opined would be carried only by a “jihadist,” a person intent on waging war in the name of God. For this, Hayat is now serving a twenty-four-year sentence in federal prison.
Notwithstanding that the testimony of the FBI informant was the most damning evidence against Hayat, Hayat was not permitted fully to cross-examine the informant about his conversations with Hayat. In addition, the district court allowed the government’s expert witness to testify that the “kind of person” who would carry the Islamic prayer found in Hayat’s wallet had “jihadi intent.” Because the district court plainly erred in preventing Hayat from introducing exculpatory evidence and in allowing inflammatory expert testimony that usurped the jury’s role as finder of fact, I would reverse and remand to the district court for a new trial.
II
At trial, the government introduced seven recorded conversations between Hayat and its star witness, FBI paid informant Naseem Khan.[2] The government also questioned Khan about his unrecorded conversations with Hayat, of which, apparently, there were many. Hayat’s statements to Khan, combined with Hayat’s meandering and almost nonsensical confession to the FBI, constitute the bulk of the evidence of Hayat’s attending a terrorist training camp. Hayat’s counsel attempted to cross-examine Khan about certain statements he claimed that Hayat made in unrecorded conversations. The most important of these is the following:
Q. During that October 7th conversation, Hamid told you that he never intended on going to a camp, and he was lying to you all along, didn’t he?
AUSA FERRIS: Objection. Foundation. Hearsay. Move to strike.
THE COURT: Sustained. It’s stricken.
Responding earlier in the cross-examination to the government’s objections to a similar line of questioning, Hayat’s counsel argued that the excluded testimony was admissible as nonhearsay to show its effect on Khan, the listener. The district court rejected this basis for admission.[3] Consequently, the prosecution was allowed to introduce inculpatory out-of-court statements Hayat made to Khan, but the defense was prevented from eliciting testimo: ny regarding Hayat’s exculpatory out-of-court statements made in the same conversation.
The majority concludes there was no plain error in refusing to admit the excluded statement “I never intended on going to a camp.” Maj. Op. at 895. I disagree. In Puckett v. United States, 556 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009), the Supreme Court explained that in order to reverse for plain error, a court must find the following: (1) there was an “error or defect-some sort of deviation from a legal rule”; (2) the error was plain, i.e. “clear or obvious, rather than subject to reasonable dispute”; (3) the error “affected the appellant’s substantial rights, which in the ordi *906 nary case means he must demonstrate that it affected the outcome of the district court proceedings”; and (4) “the error seriously affects the fairness, integrity or public reputation of judicial proceedings,” such that the court may exercise its discretion to remedy the error. Id. at 1429 (citing United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)) (quotation marks, internal citations, and alterations omitted). Applying this plain error standard, I would reverse.
A. Deviation from a Legal Rule
It is clear that the first element of the plain error analysis is satisfied — there was error, i.e., deviation from a legal rule— because Khan’s testimony was excluded despite being admissible on two, independent bases.[4] First, the testimony was admissible for the limited purpose of showing Hayat’s then-existing intent not to go to a terrorist training camp which, under the Hillmon doctrine, was admissible to prove that Hayat did not, in fact, go to such a camp. United States v. Wash. Water Power Co., 793 F.2d 1079, 1082 n. 4 (9th Cir.1986) (discussing Mut. Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), and Fed.R.Evid. 803(3)). Second, the testimony that Hayat said he never intended to go to a camp, and was lying to Khan all along, was admissible for the nonhearsay purpose of impeachment, because it contradicted Khan’s testimony that he had no reason not to believe the things Hayat told him. Fed.R.Evid. 607. Accordingly, the exclusion of this testimony as hearsay was error.
1. Then-Existing Intent
Rule 803(3) provides that “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)” is “not excluded by the hearsay rule.” Fed.R.Evid. 803(3). The state of mind exception, of course, does not include “a statement of memory or belief to prove the fact remembered or believed.” Id. Accordingly, the statement, “I never intended to go to a camp,” could not be admitted for the purpose of proving Hayat’s earlier state of mind, including whether he lied to Khan. But it is clear that, in the context of and as a response to Khan’s emphatic badgering of Hayat, the statement also communicated Hayat’s present intent not to attend a training camp. The conversation at issue took place in early October 2003 while Hayat was in Pakistan.[5] Khan testified that the previous July, Khan called Hayat and swore at him for “wasting time” taking care of his sick mother, instead of “going to a camp”; he challenged Hayat to “[b]e a man” and “do something.” In late August 2003, Khan called Hayat again, telling Ha-yat that he had complained to Hayat’s father in California that Hayat was “just sitting there [in Pakistan], wasting his time.” Khan said Hayat’s father told him Hayat would go for training after Ramadan.[6] Khan congratulated Hayat and told him that he was “very happy” Hayat would be going to a camp. In this context, Ha-yat’s statement in early October that he never intended to go to a camp indicated his then-existing intent not to do so.
*907 Hayat offers a useful example to illustrate this point: If someone asked you when you were going to the movies today and you responded, “I never intended to go to the movies today,” your response would obviously communicate your present intent not to go to the movies. Moreover, under the Hillmon doctrine, the statement is admissible as tending to prove that you did not in fact go to the movies that day. See Wash. Water Power Co., 793 F.2d at 1082 n. 4; Fed.R.Evid. 803(3) advisory committee note. Likewise, Hayat’s statement was admissible under Rule 803(3) to prove his then-existing intent not to go to a training camp, and also to prove that he did not in fact later attend such a camp. The district court thus erred in preventing Khan from answering the question whether Hayat said he never intended to go to a camp.[7]
2. Impeachment
Hayat’s statement that he never intended to go to a camp and was lying to Khan all along was also admissible for the non-hearsay purpose of impeaching Khan because, regardless of the statement’s truth, it contradicted Khan’s testimony that he had no reason not to believe the stories Hayat told him. Fed.R.Evid. 607. The government asked Khan on direct examination whether he ever called Hayat a “liar.” When Khan replied “yes,” government counsel then asked, “When you called him a liar, did you always think he was actually lying?” Khan attempted to downplay the epithet, responding, “No. Sometimes it was just like when you are talking in English, and ... someone is telling you a story, you tell them, Are you kidding? Like that.”
In cross-examining Khan, Hayat’s counsel tried to show that Hayat was a big talker or braggart who repeatedly lied and exaggerated about matters related to fundamentalism and terrorism. Khan insisted that he had no reason not to believe the various outlandish things (some demonstrably false) Hayat said — for example, that Hayat had spent time in Pakistani jail for selling counterfeit money, but had been released through his grandfather’s influence; that Hayat’s uncle was the leader of the JUI party in Pakistan; that the Taliban sent messages through a Pakistani newspaper; and that the leader of the opposition in the National Assembly of Pakistan was tied to training camps. When Hayat’s counsel pointed out that Khan had called Hayat a liar, Khan said he was “joking” and that Hayat only lied about the “small stuff,” for example, whether one could buy a cell-phone charger at a 99-Cent Store.
Hayat’s statement that he never intended to go to a camp and was lying all along was thus relevant and admissible to impeach Khan. See United States v. Arteaga, 117 F.3d 388, 397 n. 18 (9th Cir.1997) (“If a witness says ‘X’ on the stand, his out of court statement ‘not-X’ impeaches him, whether X is true or not.”). Regardless of whether the statement was true, it indicated that Khan did have a reason not to believe Hayat’s boasts about his connections to fundamentalist leaders and terrorist training camps, which was certainly not “small stuff.” Whether Hayat had been *908 lying all along or lying when he made the excluded statement, his inconsistency on a critical point gave Khan a reason not to believe him when he spoke of his involvement with and reverence for individuals seeking to conduct jihad against non-Muslims.
Because the excluded testimony was admissible on two, independent bases, the first element of the plain error analysis, the existence of error, is met.
B. “Plain” Error
The second element requires the court to find that the error was plain under existing law, rather than subject to reasonable dispute. Plain error is error “that an experienced district judge can[ ] be expected to detect ... on his own,” even “without benefit of objection.” United States v. Turman, 122 F.3d 1167, 1170 (9th Cir.1997). Thus, the error is plain if the district court, even without the benefit of hearing an applicable basis for admission from Hayat’s counsel, should have admitted the testimony.
The first basis for admission argued on appeal, Hayat’s then-existing state of mind, is a long-standing exception to the hearsay rule of which the district court was undoubtedly aware. Fed.R.Evid. 803(3); see, e.g., United States v. Armijo, 5 F.3d 1229, 1232 (9th Cir.1993) (finding plain error where trial court admitted witness’ prior inconsistent statement without a limiting instruction that the statement could be used to impeach the witness’ credibility, but not as evidence of the defendant’s guilt); United States v. Sauza-Martinez, 217 F.3d 754, 760 (9th Cir.2000) (reversing for plain error where the district court failed sua sponte to provide a limiting instruction that certain evidence was admissible only as to co-defendant). Here, the jury was asked to determine whether Hayat had attended a training camp. Aside from a government witness’ testimony that there “possibly” or “probably” was a training camp in a region mentioned by Hayat in his bumbling confession, the main evidence of whether Hayat actually went to such a camp were his statements to Khan regarding his intent to go to such a camp. If Hayat’s statements to Khan on this issue were, as Hayat argues, equivocal, changing, and contradictory, the probative value of any one out-of-court statement of intent, out of context from the others, is dubious. Fed.R.Evid. 401. Accordingly, the excluded testimony’s probative value in establishing Hayat’s intent — or lack of intent — should have been plain to the district court.
Furthermore, it is difficult to believe that even without a proper objection, the district court failed to recognize the patent unfairness in allowing Khan to provide testimony that bolstered Hayat’s inculpatory out-of-court statements (such as Khan’s testimony that he had no reason to disbelieve Hayat and, despite calling Hayat a liar, he never believed Hayat actually lied to him), while preventing the defense from eliciting testimony that would have undercut the strength of these out-of-court statements, undermined Khan’s credibility, and supported the defense theory that Hayat was a storyteller and a braggart, who — despite making outlandish claims to Khan — had no involvement with extremist Islam or terrorism. See United States v. Benveniste, 564 F.2d 335, 342 (9th Cir.1977) (holding that “the rejection of the exculpatory hearsay [testimony of a government witness] was in error, particularly in view that accusatory hearsay was admitted”). As the Second Circuit has noted, “[w]hen a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire.” United States v. Awadallah, 436 F.3d 125, 136 (2d Cir.2006). Notwithstanding that the district court *909 here did not have the benefit of hearing this basis for admission from Hayat’s counsel, the error in not admitting the excluded statements for impeachment purposes is clear on the record.
C. Substantial Rights
The third element in the plain error analysis is the error’s effect on substantial rights. The appellant must show that there is “a reasonable probability that the error affected the outcome of trial.” United States v. Marcus, 560 U.S. 258, 130 S.Ct. 2159, 2164, 176 L.Ed.2d 1012 (2010) (citing Olano, 507 U.S. at 734-35, 113 S.Ct. 1770).[8]
“[W]here, as here, the Government’s case may stand or fall on the jury’s belief or disbelief of one witness, his credibility is subject to close scrutiny.” Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953). The principle “that appellate courts give the trial judge wide latitude in control of cross-examination ... cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.” Id. at 423, 73 S.Ct. 369. In Gordon, the defendants were convicted of theft largely based on the testimony of a co-defendant, Marshall. Id. at 415, 73 S.Ct. 369. As Marshall was the prosecution’s key witness, defense counsel attempted to introduce evidence to impeach him. Id. Specifically, the defense sought to introduce: (1) contradictory statements made by the witness to the government; and (2) a transcript showing that the a judge may have influenced his testimony by stating, “I am not holding out any promises to you, but I think you would be well advised to tell the probation authorities the whole story even though it might involve others.” Id. at 416-17, 73 S.Ct. 369. Up to that point, Marshall had not mentioned any “others” in four separate interviews; soon after the hearing, he did. Id. at 422, 73 S.Ct. 369. The trial court refused to admit this evidence on cross-examination. Id. at 417, 73 S.Ct. 369. Concluding that “we cannot say that these errors were unlikely to have influenced the jury’s verdict,” the Court found that they prejudiced substantial rights and reversed. Id.
In this case, as in Gordon, the prosecution centered on the testimony of a star witness, whose credibility therefore was “subject to close scrutiny.” By excluding the testimony, the district court deprived the defense of an important and potentially effective means of impeaching Khan. The excluded evidence went to the heart of Khan’s testimony. First, the exclusion prevented the defense from impeaching Khan’s re-direct testimony that he had “no reason not to believe” Hayat intended to go to a training camp. This would have revealed that Khan — contrary to his emphatic testimony — indeed did have reason to doubt Hayat’s intent to go to a camp because Hayat said as much to Khan. Second, the excluded evidence would have supported the defense theory that Khan and the government were selectively introducing inculpatory statements of intent while omitting exculpatory statements of intent. Had the jury been permitted to hear the excluded testimony, it “might reasonably have questioned [Khan’s] reliability or credibility,” Holley v. Yarborough, 568 F.3d 1091, 1099 (9th Cir.2009) (internal quotation marks omitted), and might have discounted Khan’s colorful characterizations of Hayat as a would-be jihadist based on Khan’s own perceptions of Hayat’s state of mind. This justifies the conclusion *910 that there is a reasonable probability that the exclusion of this evidence affected the outcome of the trial.
The exclusion was a critical blow to the defense because the evidence was not— and could not have been — introduced by any other means. The excluded testimony was the sole means of impeaching the substance of Khan’s testimony (as opposed to generally impeaching Khan’s credibility by showing he was a paid informant of the FBI). Without this testimony, the defense was unable to counter Khan’s insistence that Hayat expressed the intent to attend a terrorist training camp. Accordingly, I would find that the error in excluding this testimony affected Hayat’s substantial rights.
D. Serious Effect on the Fairness of the Proceedings
The fourth element, whether the error seriously affects the fairness, integrity or public reputation of judicial proceedings, “is meant to be applied on a case-specific and fact-intensive basis.” Puckett, 129 S.Ct. at 1433. Generally, courts have relied on the presence of “overwhelming and uncontroverted evidence” of guilt as a basis for finding that a plain error did not seriously affect the fairness, integrity or public reputation of judicial proceedings. E.g., United States v. Cotton, 535 U.S. 625, 634, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); see Sauza-Martinez, 217 F.3d at 760-61 (finding that plain error affected the defendant’s substantial rights where the evidence against him “was by no means overwhelming”). Here, there is no such overwhelming evidence of guilt.
Given that the government introduced extensive inculpatory out-of-court statements and emphasized their reliability, the district court’s exclusion of a crucial exculpatory statement made under identical conditions and contemporaneously with the inculpatory statement was grossly unfair. See Benveniste, 564 F.2d at 342. Hayat had a strong interest in ensuring that the jury knew the full story of his relationship with Khan, so that the jury could evaluate the reliability and completeness of Khan’s testimony and properly judge Hayat’s intent. The selective admission of Khan’s conversations with Hayat unfairly presented a one-sided view of the evidence of Hayat’s intent. This seriously calls into question the fairness and integrity of the proceedings.
Furthermore, there is no doubt that the “public reputation” of judicial proceedings has been seriously affected by the errors in Hayat’s trial. The trial has been the subject of numerous critical news reports, magazine articles, and television programs questioning not only the government’s investigation and prosecution, but also the soundness of the judicial branch’s handling of the case. See, e.g., Frontline: The Enemy Within (PBS television broadcasts 2006) (criticizing the investigation, prosecution and trial of Hamid Hayat); Mark Arax, “The Agent Who Might Have Saved Hamid Hayat,” L.A. Times Magazine 16 (May 28, 2006) (criticizing the government’s investigation and the trial of Hamid Hayat); Amy Waldman, “Prophetic Justice,” The Atlantic Monthly 82 (Oct. 2006) (explaining possible jury bias); Chesney, supra, 80 S. Cal. L.Rev. at 491. The fourth requirement of the plain error analysis, therefore, is satisfied.
All four elements of the plain error doctrine having been satisfied, I would exercise our discretion and reverse and remand for a new trial.
Ill
The government’s expert witness, Kha-leel Mohammed, teaches Islamic studies and is an erstwhile imam. He has experience in translating and interpreting prayers from a “faith based perspective, as well *911 as from an academic perspective.” Mohammed testified on direct examination that he translated from Arabic a written supplication found in Hayat’s wallet. He translated it as: “Oh Allah we place you at their throats and we seek refuge in you from their evils.”[9] He then testified that the supplication, was “not peaceful” because he looked up the supplication in several commentaries, and “just about every commentary [the expert] checked puts it [the supplication] in a ease where someone who is in jihad makes this supplication, someone who is at war with a perceived enemy....” The following exchange then occurred between the prosecutor and the government’s expert:
Q. Based on your research and experience, what is the context, then, of this supplication?
A. The context of the supplication is for when one is engaged in war, a holy war, fighting for God, against an enemy that is perceived to be evil.
Q. In your opinion, would a particular kind of person carry this supplication?
A. Yes. A particular kind of person would carry this supplication.
Q. What kind of person?
A. A person who perceives him or herself as being engaged in war for God against an enemy.[10]
Mohammed further testified that a person carrying this supplication would be “[a] person engaged in jihad.” He insisted that “there is no other way that it could be used.” He elaborated that it would be fair to say that this person would be a “jihadist” or “part of the mujahedeen.” Among other sweeping conclusions, Mohammed explained that carrying this particular supplication means a person: “has to be involved in jihad”; must “perceive[ ] himself to be carrying out one of the obligations of' jihad, that he was involved in what he deemed to be jihad”; and “was completely ready. The person was in the act of being a warrior.”[11]
Notwithstanding Mohammed’s blanket conclusions regarding Hayat’s readiness to “engage in war,” Hayat’s counsel failed to object. As a consequence, the court may review only for plain error. Even under this more stringent standard of review, however, I would conclude that the district court plainly erred in allowing Mohammed to testify broadly about Hayat’s supposed “jihadi intent,” which usurped the jury’s role as ultimate finder of fact.
The majority concludes that this testimony is not an improper opinion on Hayat’s mental state constituting an element of the crime charged. Maj. Op. at 902. I strongly disagree. Fed.R.Evid. 704(b) provides that “[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.” These are “ultimate is *912 sues” to be decided by “the trier of fact alone.” Id. From the record, it is clear that Mohammed stated an opinion as to Hayat’s mental state. The linguistic nicety of referring to “a person who would carry this supplication in his wallet” rather than “Hayat” cannot save Mohammed’s testimony. Moreover, Mohammed flatly and categorically testified that a person carrying this supplication “has to be involved in Jihad.” It is plain on the record that “a person” could have been no one but Hayat.[12] The violation of rule 704(b) is plain and obvious. See Puckett, 129 S.Ct. at 1429.
The majority nonetheless relies on United States v. Younger, 398 F.3d 1179 (9th Cir.2005), abrogated on other grounds as stated in United States v. Vongxay, 594 F.3d 1111, 1116 (9th Cir.2010), a case about expert testimony relating to the drug trade, and similar cases, to conclude that Mohammed’s testimony was not improper. Maj. Op. at 901. The majority’s conclusion, however, stretches the Younger line of cases beyond the breaking point and beyond the limits of its logic. In Younger, a police lieutenant testified “as an expert in the methodology of possession, use, manufacture, and distribution of illicit narcotic substances.” Id. at 1188. The lieutenant testified that “[t]he person” who possessed the quantity of drugs at issue in the case possessed it for the purpose of selling it. Id. at 1189. In evaluating the propriety of this expert testimony, the court explained that Rule 704(b)
does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, “so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.”
398 F.3d at 1189 (quoting United States v. Morales, 108 F.3d 1031, 1038 (9th Cir.1997)). Deciding to admit the testimony at issue, the court noted that “[ajlthough the prosecutor’s questions brought the testimony close to Rule 704(b)’s line of prohibition ... the jury could have accepted his testimony and still infer that defendant was atypical.” Id. But here, Mohammed’s flat out, categorical statement crossed the Younger line because it left no room for the jury to infer anything other than that Hayat “has to be involved in jihad.”
Younger relied on several earlier cases regarding expert testimony about the “methodology” of the narcotics trade. In United States v. Gonzales, for example, a federal agent testified that “an individual” possessing the amount of drugs at issue in the case possessed them for sale and not personal use. 307 F.3d 906, 911 (9th Cir.2002). The agent testified that combined with possession of a handgun and scales, his opinion that the quantity of drugs at issue indicated an intent to distribute “extremely firm.” Id. The court concluded that this testimony did not run afoul of Rule 704(b) because even if the jury credited the agent’s testimony, it “could have concluded that Gonzales was not a typical or representative person, who possessed the drugs and drug paraphernalia involved.” Id. Together, Younger and its forebears establish a general rule that
[gjovernment experts may “testify as to the general practices of criminals to establish the defendants’ modus operandi” which “helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indi *913 cate criminal behavior.” United States v. Valencia-Amezcua, 278 F.3d 901, 908-09 (9th Cir.2002) (quoting United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir.1984)). We have allowed mo-dus operandi testimony that “drug traffickers often employ counter-surveillance driving techniques, register cars in others’ names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones.” Id. at 909 n. 4.
United States v. Freeman, 498 F.3d 893, 906 (9th Cir.2007); see also United States v. Anchrum, 590 F.3d 795, 804 (9th Cir.2009) (finding government agent’s testimony about why a hypothetical drug dealer would possess a firearm to be permissible expert testimony on the modus operandi of drug dealers).
The majority likens Mohammed’s testimony about the state of mind of a person who would carry a written prayer in his wallet to that of law enforcement officers who testify about the modus operandi of “a person” who carries a large quantity of drugs, a firearm, and scales. Maj. Op. at 901-02. The factual scenarios are dissonant. In the Younger line of cases, the government experts at issue are law enforcement officers experienced in investigating the drug trade and related crimes. These officers testified about the signature accouterments of the drug trade and the modus operandi of drug dealers. Here, Mohammed, although professing some knowledge that jihadists may carry supplications, did not testify as an expert on the modus operandi of Islamic terrorists. Notwithstanding his lack of expertise in that field, he opined on what was in the heart and mind of a person who would carry a written prayer in his wallet.
As the Fifth Circuit recently noted, there is a fine but critical line between expert testimony concerning methods of operation unique to the drug business, and testimony comparing defendant’s conduct to the generic profile of a drug courier. The former may be permissible to help a jury understand the significance and implications of other evidence presented at trial. The latter may im-permissibly suggest that an innocent civilian had knowledge of drug activity ... The inquiry does not turn on magic words, and the purpose of the inquiry must be to determine whether expert testimony is the “functional equivalent” of an opinion that the defendant knew he was carrying drugs.
United States v. Gonzalez-Bodriguez, 621 F.3d 354, 364 (5th Cir.2010) (citations omitted). Mohammed’s opinion testimony stepped over this “fine but critical line.” Rather than testifying about the modus operandi of would-be terrorists,[13] Mohammed repeatedly stated that “a person” who would carry the supplication at issue was ready to engage in war, perceived himself as “a warrior,” and was certainly a “jihadist” or part of the mujahadeen. In short, Mohammed’s testimony is the “functional equivalent” of an opinion that Hayat had the requisite intent to provide material support for terrorism — because he could not be anything other than a “jihadist.” Once an expert labels someone a “jihadist,” what is left for the jury to determine? The jury could not but reach the conclusion that a “jihadist” is guilty of “providing material support for terrorism.” There was no wiggle room for the jury to determine that Hayat was “atypical” and thus reach another conclusion. Younger, 398 F.3d at 1189.
Furthermore, and perhaps more importantly, carrying a prayer in one’s wallet is *914 fundamentally unlike carrying the signature tools of the drug trade. It is one thing to say that possessing drugs and scales indicates intent to sell drugs; it is quite another to say that carrying a religious invocation in one’s wallet demonstrates intent imminently to engage in acts of war. One is a conclusion drawn from the physical presence of tools, and employment of methods, commonly used in the drug trade. The other is a written prayer, whose meaning to any particular faithful likely is obscure. This is particularly so in this case because Hayat did not speak or read Arabic, the language in which the prayer was written.
An analogy may be helpful. Suppose a Christian is arrested on suspicion of providing material support for terrorism. In the suspect’s wallet is found the following excerpt: “Onward, Christian soldiers, marching as to war/ With the cross of Jesus going on before/ At the sign of triumph Satan’s host doth flee/ On then, Christian soldiers, on to victory!” An academic, an expert on the Bible and its translation, is called to testify at the suspect’s trial. Asked what kind of person would carry this hymn, the academic testifies, “A person who believes him or herself as being engaged in a war for [Jesus] against an enemy.”
Such testimony would be laughable. We easily comprehend, without the aid of expert testimony, that “‘Onward, Christian Soldiers’ does not mean that the zealous churchman is literally militant.” Berg v. State, 29 Okla.Crim. 112, 233 P. 497, 503 (App.1925). Someone carrying it might be a non-violent volunteer for the Salvation Army, or a Methodist, or a supporter of the phrase “under God” in the Pledge of Allegiance. See Newdow v. Rio Linda Union Sch. Dist., 597 F.3d 1007, 1056-57 (9th Cir.2010) (Reinhardt, J., dissenting) (describing the celebratory playing of “Onward, Christian Soldiers” after Congress amended the Pledge of Allegiance to add the phrase “under God”). Alternatively, the person could be a member of the Ku Klux Klan. See Virginia v. Black, 538 U.S. 343, 356, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (describing the singing of “Onward, Christian Soldiers” at cross burnings). It is inconceivable that a court would allow an “expert” to opine definitively and categorically on the “kind of person” who would carry “Onward, Christian Soldiers” in his wallet because the conceivable variations in understanding and motivation are too great.[14] Yet this is exactly what the government expert in this case was permitted to do with respect to the prayer found in Hayat’s wallet.
In the hypothetical, it is clear that the expert’s testimony is both over-the-top and invades the province of the jury. There is an absence of clarity in this case simply because the testimony was given in relation to Islam, a religion whose tenets are unfamiliar to the vast majority of Americans.[15] The jurors in Hayat’s trial, there *915 fore, were particularly susceptible to deferring to Mohammed’s “expert” testimony not only as to the translation and meaning of the supplication, but also as to the ultimate question of whether the supplication proved that Hayat was a “jihadist” (ie., a terrorist) — the kind of person who would carry such a prayer.
Accordingly, it was patently improper to allow Mohammed to testify beyond the translation of the supplication from Arabic into English and the meaning of the supplication, if he knew. His testimony went beyond translation and interpretation— Mohammed testified specifically about the “kind of person” who would carry the supplication. He testified about such a “person’s” intent. This is crucial here. The government’s theory was that Hayat went to a terrorist training camp and returned to the United States intent in engaging in some undefined future act of terrorism. Hayat’s intent to support terrorism is an “ultimate inference or conclusion” that the jury should have decided for itself. See United States v. Morales, 108 F.3d 1031, 1037 (9th Cir.1997) (“A prohibited ‘opinion or inference’ under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea.” (emphasis added)).
Given the translation alone, or even the translation plus Mohammed’s testimony that the supplication was cited in scholarly commentaries in the context of warfare, the jury had enough information to conclude for itself whether the presence of the supplication in Hayat’s wallet supported an inference that he had the requisite intent to provide material support for terrorism. That is all the jury should have heard. The additional testimony about the “kind of person” who would carry such a supplication and such a person’s intent was not only inflammatory, it invaded the province of the jury. The jury’s authority, plainly, was ceded to the expert.
IV
Because the district court plainly erred in preventing Hayat from introducing exculpatory evidence and in allowing inflammatory expert testimony that usurped the jury’s role as finder of fact, I would reverse Hayat’s conviction and remand to the district court for a new trial. I therefore respectfully dissent.[16]

. A.P. Herbert, Rex v. Haddock: Is it a Free Country?, in The Uncommon Law 24, 28 (1935) (“It is not for me to say what offence the appellant has committed, but I am satisfied that he committed some offence, for which he has been most properly punished.”).

. Khan was paid more than $200,000 by the FBI. At one point, Khan informed the FBI that he had regularly observed Osama bin Laden’s second-in-command, Ayman al Zawa-hiri, at a mosque in Lodi, an assertion the government now concedes is false.

. Hayat’s counsel did not offer a basis for admission after this objection was overruled, perhaps because of the district court’s ruling on the earlier objections.

. The testimony was also arguably admissible under the rule of completeness. See Fed.R.Evid. 106.

. Khan testified that it was the last time they spoke to each other before Hayat returned to the United States in May 2005.

. In 2003, Ramadan fell between late October and early November.

. The majority notes, somewhat puzzlingly, that Hayat failed to ask for a limiting instruction, which would have been necessary if the excluded testimony was admitted to show then-existing intent. Maj. Op. at 895-96. This is neither here nor there. It is undisputed that Hayat failed to advance an appropriate basis for admission of the excluded testimony — that is why it is being reviewed for plain error and not abuse of discretion. It is unclear why the majority thinks Hayat’s counsel should (or even could) have sought a limiting instruction related to a ground for admission that she ignorantly or inadvertently failed to advance.

. Because the majority concludes (wrongly, in my view) that there was no plain error, it does not address this factor.

. This supplication also bears a striking similarity to the well-known Old Testament story in which David, after being rescued from Saul and his enemies, recites to God: “Thou hast also given me the necks of mine enemies, that I might destroy them that hate me.” 2 Samuel 22:41.

. Mohammed later elaborated that the "enemy” referred to in the supplication could only be “an enemy of God.”

. Inexplicably, irrelevantly, and prejudicially, the government questioned Mohammed about "warriors in Africa” who might carry amulets as protection. Mohammed then testified about "warriors in Eritrea, warriors in Southern Sahara,” and the Egyptian Muslim Brotherhood.

. Mohammed opined on the kind of "person” who would carry this supplication only after testifying that the particular supplication at issue was "rare.” This left little room for the jury to conclude that Hayat was "atypical.”

. The record does not indicate that Mohammed's expertise as an Islamic scholar and in Arabic made him an expert on the modus operandi of Islamic terrorists, let alone on Pakistani terrorists.

. One can imagine what would happen if the hypothetical suspect were apprehended in another country, one without our familiarity with Christianity. "In an Oriental missionary field, ‘Onward, Christian Soldiers’ is said to be regarded as an alien, seditious war song, the use of which the missionaries had to abandon." Colyer v. Skeffington, 265 F. 17, 59 (D.Mass.1920) (granting writs of habeas corpus to petitioners detained pending deportation because the Commissioner of Immigration failed to establish that petitioners’ membership in the Communist Party meant they advocated the violent overthrow of the United States government), reversed sub nom. Skeffington v. Katzeff, 277 F. 129 (1st Cir.1922).

. A Pew Research Center poll found that in 2005 (at the time of Hayat’s trial), 66 percent of Americans knew "not very much" or "nothing at all” about the Muslim religion. Public Remains Conflicted Over Islam, http://pewforum.org/Muslim/Public-Remains-Conflicted-Over-Islam.aspx (Aug 24, 2010). *915 Given this, it is probable that most Americans — and many of the jurors in this case— are unaware of diversity of belief and culture among Muslims. "Like other religions, Islam also has different — and sometimes contending — theologies, law schools, and Sufi (mystic) orders.” John L. Esposito & Dalia Mogahed, Who Spealcs for Islam?: What a Billion Muslims Really Think 3 (2007).

. Because I would reverse the conviction for each of the two errors discussed in this opinion, I do not reach Hayat’s third major contention — that Juror Joseph Cote was biased— which the majority also rejects. See Maj. Op. at 885-91.